[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION AFTER TRIAL ON THE MERITS
The fundamental issue in the above-captioned case is whether the minds of plaintiff Laljeebhai Patel and defendant Dilip Barot met on sufficient terms concerning an effort to develop public housing for the Bridgeport Housing Authority to constitute an enforceable contract. This court finds that the plaintiffs failed to prove that their expectations concerning their relationship with the defendants ripened to a definite agreement whose essential terms were mutually agreed to by both sides.
The plaintiffs are Laljeebhai Patel, a businessman who engaged in housing development projects during the 1990's, and Capital Development Group, LLC, a Connecticut limited liability company controlled by Patel. The defendants are Dilip Barot, a Florida resident who is the sole shareholder of defendant Creative Choice Homes, Inc., ("CCH-Florida") a Florida company that has completed public housing projects in several states. The additional defendant is CCH Bridgeport, LLC ("CCH-Bridgeport"), a Connecticut limited liability company with an office in Bridgeport, Connecticut. At all relevant times, Barot owned, directly or indirectly, a controlling interest in CCH-Bridgeport.
In their fourth revised complaint, the plaintiffs allege that Barot and CCH-Florida had agreed to undertake a public housing development project in Bridgeport as a joint venture with the plaintiffs and that the defendants breached the agreement by failing to share the alleged profits with the plaintiffs (Count One). Alternatively, the plaintiffs claim that they are entitled to recover in quantum meruit for the reasonable value of services performed on the project (Count Two). At the conclusion of the evidence, the court granted the defendants' motion for evidentiary nonsuit as to Count Two, the quantum meruit claim.
Accordingly, the only claim to be decided is the plaintiffs' claim that they entered into a contract with the defendants that entitled them to half the developer profits realized from the development of public housing units in Bridgeport under a project known as the Father Panik Village Replacement Housing project.
The defendants pleaded several special defenses. In view of the court's finding that the plaintiff has failed to prove the existence of an enforceable contract, it is not necessary to discuss these defenses. CT Page 15551
The court has granted judgment in favor of the plaintiffs on all counterclaims asserted by the defendants, pursuant to a motion invoking Practice Book 15-8 made by the plaintiffs at the conclusion of the defendants' evidence. The defendants had sought to withdraw the counterclaims after the trial had been in progress for 14 days. Pursuant to Conn. Gen. Stat. § 52-80, the court denied the defendants leave to withdraw their counterclaims after trial had commenced, as such a withdrawal might have required the plaintiffs to defend the same claims in another trial. The defendants did not oppose the court's granting the Practice Book § 15-8 motion as to their counterclaims.
Procedural history
The case was commenced in the Judicial District of Hartford at New Britain in 1996 and was transferred to the complex litigation docket along with a related case for management and trial. Trial to the court, without a jury, commenced on October 4, 2001 and ended on November 1, 2001. The case was tried with a companion case, Plotkin v. Barot, Docket No. X01 CV 97 0162347, in which the plaintiff similarly claimed a right to a share of the profits and/or compensation for services rendered to the defendants. The court set November 16, 2001, as the deadline for filing simultaneous post-trial briefs.
Findings of fact
In 1995, Charles Tisdale, a Bridgeport resident who had worked in Bridgeport antipoverty programs and, from 1985 through 1988, as director of planning and development in the administration of Mayor Thomas Bucci in Bridgeport, introduced Patel to Barot, with the thought that these two businessmen with roots in Gujarat, India, might be interested in working together on projects in Connecticut. At that time, Patel was a lawyer who had left the law firm where he had been employed and who was not engaged in the active practice of law. His practice at Schatz, Schatz, Ribicoff 
Kotkin had included bond financing, and he had participated in development transactions. Barot, an immigrant who had started his own Florida-based development firm after working as a night clerk in motels, had completed some public housing projects and had bid on others in a number of states. Patel and Barot worked together on a proposal to develop public housing project in New Haven, Connecticut known as Elm Haven. In 1995 to 1996, they also pursued a second New Haven housing project known as the Florence Virtue housing project in a relationship that was not memorialized in a written contract and about which they later had disagreements.
In late 1995, Patel and Barot turned their attention to a public CT Page 15552 housing development that the Bridgeport Housing Authority was proposing. Having been ordered in a consent decree entered in Concerned TenantsAssociation of Father Panik Village v. Samuel Pierce, Secretary of theDepartment of Housing and Urban Development, USDC Civ. No. B-87-809 TFGD, to replace the public housing units at a notoriously troubled housing project known as Father Panik Village, the housing authority had access to funds from the federal department of Housing and Urban Development ("HUD") to build replacement housing. The consent decree required provision of 1063 units of replacement housing within six years of HUD's approval of demolition of the Father Panik buildings. The housing authority announced a request for proposal ("RFP"), a document requesting written proposals to develop replacement housing including both a turnkey project to be funded by HUD and private units to be financed from mixed sources, including the sale of tax credits and loans from banks. The RFP specified that units of public housing were to be built on scattered sites. No sites had been selected, nor was the number of units that could be developed at each site specified. The housing authority appointed a selection committee to choose among the responses to the RFP. The winner was to be the "preferred developer," an entity entitled to develop and build the units authorized in the RFP without having to bid on each segment or site individually.
The RFP did not specify whether the candidates for "preferred developer" status had to be corporations, partnerships, individuals or any other particular form of entity. The RFP specified that each candidate must submit by January 26, 1996, a proposal containing particular documents and schedules. The RFP included the information that the housing authority's sole source of funding was $45 million of HUD development funds and stated that the party selected as the preferred developer would enter into separate contracts with the housing authority for new construction, rehabilitation projects, and turnkey projects. The RFP noted that applicants should "provide a list of people who will be assigned to this contract" and provide a biographical sketch for each. It further stated that proposals would be judged in part on the basis of the applicant's "[d]emonstrated successful experience in utilizing minority and women female (sic) owned business and compliance" and "experience in hiring and training Section 3 residents." (Ex., p. 211, p. 9.) "Section 3" is a reference to a portion of the Housing and Urban Development Act of 1968, 12 U.S.C. § 1701u, which requires creation of opportunities for training and employment of low income residents and participation by local businesses.
Patel and Barot decided to put together a team to draft a proposal. Based on his conversations with Tisdale and his observations of municipal affairs in Bridgeport, Patel considered that the housing authority's selection committee was most likely to favor a proposal that included CT Page 15553 local people and people of color as participants. Patel had contacts with Dr. Murali Atluru, an engineer of Indian descent who was the principal in a Connecticut design and engineering firm known as Diversified Technologies Corp. ("DTC"). Patel also had contacts with an African-American Waterbury attorney, Maurice Mosley, and his brother, Ernest Mosley, who had been a deputy director of the Bridgeport Housing Authority. Charles Tisdale, who in 1995 and 1996 was employed by an anti-poverty agency in Bridgeport and who had also been employed by HUD for a time, suggested to Patel that a Bridgeport real estate lawyer, Nathaniel Plotkin, should be made part of the team in order to further emphasize the team's local character.
Patel approached Rashid Hamid of Naek Construction Co. with a proposal that Naek be the general contractor to build the housing units. Naek Construction had participated with Barot and Patel in making a unsuccessful proposal to develop the Elm Haven project in New Haven. Barot, who had had no prior dealings in Bridgeport, persuaded Beverly Johnson, a Boston-based African-American consultant who worked on community liaison issues and Section 3 hiring for such housing developments. He also brought in LAM Design.
Memos and faxes sent back and forth between Patel and Barot and his assistant, Rhiannon Clapp, reflect that in late 1995 the two men were working out a plan for an application for the Father Panik Replacement Housing project. Patel set up meetings and referred to the need to decide "the structuring of our team." (Ex. 4.) Patel suggested that a housing specialist, Ruth Price, who had experience in housing issues in Bridgeport, be approached about joining the team. (Ex. 159.) Barot never objected to Patel's assumption that the proposal was being put together by a team, however, he never specified in writing or orally what the arrangements between team members were to be. When introduced to people in development circles in Connecticut, including Tomas Reyes, a New Haven politician, Barot loosely referred to Patel as his "partner" in various housing projects; however, Barot never actually committed himself to forming a partnership, drafting a partnership agreement, or even spelling out orally the terms of his relationship with Patel concerning the Bridgeport project. The court does not find that the use of the word "partner" in informal conversations in which the exact nature of relationships was not at issue establishes, as Patel urges, an agreement to share 50%-50% in a joint venture.
Patel was not in good graces with the mayoral administration in office in Bridgeport in 1996, and for this, and perhaps other reasons, he sought to keep his participation quiet lest it disadvantage the proposal on which he was working with Barot CT Page 15554
Patel and Barot suggested to those whom they persuaded to help formulate the proposal that they would have a stake in the project as "team members;" however, they entered into no definite agreements with any of them concerning any entitlements to shares in profits from the project.
Patel testified that he believed that he and his company, Capital Development Group, LLC, were to be equal partners with Barot and his company, CCH-Florida. The court finds that this belief was not based on any actual agreement to which Barot ever gave his assent. Instead, Barot freely used the term "team" and willingly accepted information offered to him by Patel and others who expected to participate in the project while steering clear of any actual, definite commitments to any of them up to the time of submitting the proposal to the housing authority. Barot never disabused Patel of his expectations; rather, he neither affirmed or denied them, but let Patel continue to hold meetings, drum up enthusiasm, and obtain unpaid services from those who were referred to as "team members."
In late December 1995 and January 1996, the various people assembled by Patel and Barot to formulate a proposal met and developed a proposal for submission to the Bridgeport Housing Authority on January 26, 1996. Though the cover of the proposal identified the applicant as "Creative Homes, Inc. Team," the text of the proposal identified CCH-Florida as the applicant, asserting that "CCH has the expertise and demonstrated experience to perform the tasks required to complete the comprehensive planning and construction of up to 412 units of low income housing as well as providing additional units of moderate and mixed income housing." (Ex. 8, p. 1.) The CCH proposal nowhere identifies Patel or his company as co-proposers. Patel's name does not appear in a list of entities represented as members of "a dynamic team with the capacity to tackle each of the core functions required for this development project." (Ex. 8, p. 1.) The proposal is signed by John F. Weir, who is identified as a senior vice president of CCH-Florida.
Preparation of a response to an RFP is usually undertaken as a speculative venture by the contractors, developers and design professionals involved. Rashid Hamid and Murali Atluru testified without contradiction that entities that contribute information on pricing and other matters for use in a proposal in a competition of this sort do so without charge with the expectation that they will be hired to perform the work if the proposal is successful. If it is not successful, those who contributed to putting the proposal together do not look to each other for compensation for the work they have performed but absorb their costs in time and effort as part of the costs of looking for new business. CT Page 15555
Patel presented no evidence that the defendants ever agreed to compensate him specifically for services performed in connection with the preparation of the CCH-Florida response to the Bridgeport RFP.
By a letter dated March 18, 1996, the Bridgeport Housing Authority advised John Weir, senior vice president of CCH-Florida, that "we have selected your firm to become our designated Preferred Developer for the Father Panik Village Replacement Housing Plan subject to our negotiating a firm contract price." (Ex. 11.)
After his firm received the designation as preferred developer for the project, Barot began distancing himself from several of the persons and entities that had assisted in putting together the proposal to the housing authority or whose names had been listed in the application as local entities who would be involved in the project with CCH-Florida.
In April 1996, Patel, concerned that Barot was proceeding without consulting him or others who had been referred to as "team members," entered into negotiations with Barot through the exchange of drafts of a proposed agreement concerning division of the profits of the Bridgeport project. (Ex. 231.) Patel did not refer to any preexisting oral agreement in any of these overtures, and the court concludes that there was no preexisting oral agreement of any definite nature, but only a vague expectation that Patel would somehow participate, with no meeting of the minds as to amount or extent of compensation.
Barot marked up a draft of the agreement proposed by Patel (Ex. 232) but never signed any version of it. (Patel added his own handwritten comments on the portion of the document titled "Appendix A.") Patel's communications concerning drafts of agreements that he and Barot were discussing in April 1996 contain no references to memorializing any existing verbal agreement for a joint venture. In a hand-written memo which he faxed to Barot on May 5, 1996, Patel wrote, "Dilip, today we must conceptually work out our Agreement." Apparently referring to an attached page from a proposed draft, Patel stated "I have given you almost everything on silver plate. I hope we eat together as agreed. Question: Are you looking for no financial commitment?? see attached?? Let's talk and work this satisfactorily to both." (Ex. 238.)
The court finds that the sequence and contents of the documents exchanged suggest that Patel, seeing that Barot was shedding the other team members, was willing to do the same and was seeking only to salvage some share in the project for himself, having failed to obtain any definite terms at any time before the April 1996 communications with Barot. CT Page 15556
Though Patel had told Nathaniel Plotkin, the Bridgeport lawyer who had been identified as part of the "team" in the response to the RFP, that Plotkin would do the local legal work for the project, Patel advised Barot to hire another attorney, Robert Berchem, to prepare the actual contract with the housing authority. Patel entered into an oral agreement, which he kept secret from Barot, to receive a share of any profits realized by Naek Construction from the project. Memos written by Dr. Atluru of Diversified Technologies, the engineering firm that had been led to believe it would gain business from the project, indicate that Patel was discussing with Atluru, Hamid and others ways to undercut Barot by reporting to the Bridgeport Housing Authority that the local parties identified in the CCH-Florida proposal were being sidelined. Patel's manner of behaving with regard to this project thus was not straightforward or aboveboard in many respects. These indications of his style of proceeding support the conclusion that while he was expending time and machinations to the project, he did so without first having reached a clear, definite commitment from the defendants as to his role and compensation, probably in order to conceal his participation from Bridgeport and HUD officials.
Patel had no capacity to finance, construct, engineer or otherwise contribute anything like equal efforts to the accomplishment of the project. He testified that he had no intention of performing any services in the actual development, perhaps because he may not have been able to satisfy HUD requirements for participants. While Patel clearly believes that in helping to assemble a list of firms and people that would be appealing to the housing authority he performed a service that led to the selection of CCH-Florida as the preferred developer, he has presented no credible evidence that supports the conclusion that Barot ever agreed that this service was so considerable that Barot agreed to split the developer's profits equally with him.
Patel testified that he had reached an oral agreement with Barot in January 1996. He did not testify where or when Barot agreed to the alleged contract. In his first description of the alleged oral agreement, he stated that the parties were to be Patel and his company, Capital Development Group LLC and Barot and his company, CCH-Florida. Later in his testimony, he stated that his agreement was only with Barot individually.
On cross-examination, Patel acknowledged that other members of the "team" had been identified as having a prospect of sharing in the profits from the project. Referring to discussions concerning participation of these others in the alleged joint venture, Patel testified that he could not recall whether the various views had come together in an agreement in CT Page 15557 this regard. He did not explain how other team members were to have shares in a joint venture if there was already an agreement by which he and Barot would divide all profits equally.
Though Patel claimed to have referred to the project as a joint venture in speaking to others, no witness confirmed that such a statement had even been made. Robert Berchem, the attorney whom Patel approached to draft the contract with the housing authority, testified that he had never been told that the party contracting with the housing authority was actually a joint venture in which Patel was a party. John Weir, vice president of CCH-Florida, had never heard that the project was to be a joint venture, nor had the proposed general contractor, Rashid Hamid of Naek Construction. Since Patel was a lawyer with considerable experience in development documentation, the court finds that the facts set forth above suggest the absence, not the existence, of any definite agreement between the parties.
In May 1996, after considering a proposal made by Patel (Ex. 232), Barot sent Patel a proposed agreement (Ex. 239) which provided that Patel's Company, Capital Development Group LLC, would receive "a mutually agreed upon percentage of Development Fee earned by CCH. Such fee and mutual percentage shall be determined within (30) days of completion of the planning phase, as described in the Development Agreement." This proposed agreement conditioned payments to Patel's company on "reaching satisfactory agreements with and performance of: Maurice Mosley, Ernest Mosley, Charles Tisdale, Naek Construction, Diversified Technologies Corp." At the time, those entities were objecting that, contrary to their expectations, they had not entered into any written contracts either for a division of developer profits or to perform services on the Bridgeport project. The proposed agreement provided that both Barot's company and Patel's company the option of terminating on thirty days' notice, and it provided that in case of such termination, "both parties shall mutually agree to an amount to be paid." Even this largely ephemeral proposed agreement was never signed by the parties identified in it.
Clarence Craig, the housing authority's executive director, resisted the efforts of Naek Construction and other team members to be included as parties in the contract that was to effectuate the preferred developer's status and entitlements. The housing authority took the position that it had awarded preferred developer status to CCH-Florida and that it would enter into a contract with that entity. It ultimately agreed to add another party, a new limited liability company formed by Barot, CCH-Bridgeport. On August 13, 1996, the housing authority signed a contract with CCH-Florida and CCH-Bridgeport. (Ex. 12). Patel held no interest in CCH Bridgeport, LLC, which was wholly owned by Barot and interests under his control. CT Page 15558
Planning and executing a project on scattered sites proved to be laborious and contentious. The preferred developer selected sites only to run into opposition from local groups and municipal zoning authorities. As of the date of trial, Barot and his companies had renovated or built only twenty units. They collected $800,000 for these units and another $1 million for the planning phase of some additional projects, from which they must pay for costs incurred for construction, engineering and other services. They have billed the housing authority for an additional $1.8 million, much of which represents their obligations to third parties who performed services. That claim has been rejected by HUD, which reviews the invoices to the housing authority, and the matter is in arbitration, as required by the August 13, 1996 contract between the housing authority and CCH-Florida and CCH-Bridgeport. It was not demonstrated that any of the defendants has yet realized any developer's profit from the Bridgeport project.
In 1995 and 1996, Patel and Barot were engaged in developing a public housing project in New Haven known as the Florence Virtue project. They had no written agreement concerning that project, either, however, in August 1996 they reached an agreement for division of proceeds. They did not reach such an agreement with regard to the Bridgeport project.
Elements of a contract
Under Connecticut law, the existence of a contract has consistently been held to be a matter not of law but of fact. Finley v. Aetna Life Casualty Co., 202 Conn. 190, 199 (1987), overruled on other grounds,225 Conn. 782, 786 (1993); Harry A. Finman Son, Inc. v. ConnecticutTruck Trailer Service Co., 169 Conn. 407, 409 (1975); RandolphConstruction Co. v. Kings East Corp., 165 Conn. 269, 272 (1973) ("[w]hether a contract exists is a question of fact for the court to determine"); accord, Bridgeport Pipe Engineering Co. v. DeMatteoConstruction Co., 159 Conn. 242, 249 (1970); Molloy v. Rourke,83 Conn. 196, 199 (1910); Manzin v. United Bank Trust Co.,6 Conn. App. 513, 516 (1986).
The plaintiffs assert that the contract at issue is a contract for a joint venture. In the analogous context of claims of breach of an oral partnership agreement, the appellate courts have ruled that "[w]hether an oral partnership agreement has been entered is a question of fact."Jacobs v. Thomas, 18 Conn. App. 218, 222 (1989); Kaspar v. Anderson,5 Conn. App. 358, 361, cert. denied, 197 Conn. 818 (1985).
In order to prevail on their claim of breach of an oral agreement, the plaintiffs must prove that the defendants agreed to participate in a joint CT Page 15559 venture and agreed to terms definite enough to permit enforcement. While an oral agreement may be proved to have been reached even if some of the terms are not agreed to immediately, see Willow Funding Co., LP v.Grencom Associates, 63 Conn. App. 832, 843-44 (2001), numerous Connecticut cases require definite agreement on the essential terms of an enforceable agreement. Id., 845. An agreement to make a loan that is not definite as to the amount of the loan is unenforceable. SuffieldDevelopment Associates Ltd. Partnership v. Society for Savings,243 Conn. 832, 843 (1998). An agreement to subordinate a mortgage that is not definite as to the position or amount to be subordinated is unenforceable. LR Realty v. Connecticut National Bank, 53 Conn. App. 524,537, cert. denied, 250 Conn. 901 (1999).
In Coady v. Martin, 65 Conn. App. 758, 767-68 (2001), the Appellate Court recently held that where parties entered into a contract that provided that both would be "members" of a company but failed to agree on the percentage of equity to which each was entitled, the membership agreement was unenforceable because the extent of each party's interest was an essential term. As the findings of fact set forth above demonstrate, the situation presented in the case before this court closely resembles the circumstance in Coady v. Martin.
To form a valid and binding contract in Connecticut, there must be a mutual understanding between the parties of the essential terms that are definite and certain. See Ubysz v. DiPietro, 185 Conn. 47, 51 (1981);Augeri v. C.F. Wooding Co., 173 Conn. 426, 429-30 (1977); LR Realty v.Connecticut National Bank, supra, 53 Conn. App. 534; Cavallo v. Lewis,1 Conn. App. 519, 520 (1984).
In the present case, the plaintiffs assert that the defendants had agreed to a joint venture, but they presented no credible evidence of any agreement concerning some essential terms, notably, the percentage of the division of the profits to be received by each and the assets and labor to be contributed by each participant. At various times they envisioned that additional team members would also participate in the joint venture, and the evidence does not establish that the loose discussions of a joint venture ever reached a final form as to either participants or the percentage of the interest of each.
The plaintiffs ask this court to surmise that when two parties act together on a project, the project becomes a joint venture, and that because there are two parties, the court should assume that they agreed to divide profits equally. While Barot agreed to work with Patel to secure preferred developer status, no credible evidence supports a conclusion that the defendants ever agreed that this cooperation would take the form of a joint venture or partnership from which the plaintiffs CT Page 15560 would receive any particular percentage of distribution of profits. While the defendants allowed Patel to think that he was a player in the project, there is no evidence that Barot ever actually agreed to a joint venture with Patel, and Barot consistently proceeded under corporate forms in which Patel had no stake. There is further no evidence that Patel and Barot ever came to any agreement, oral or otherwise, concerning the amount or extent of any compensation or division of profits.
The two men had proceeded in the same loose way with regard to the Florence Virtue project in New Haven, and had agreed on a division of proceeds not at the inception of the project but only after the project was underway. No testimony was presented of any agreement to treat the Bridgeport project in the same way as the New Haven project, rather, the parties pursued separate negotiations with regard to each project. The parties never reached an agreement on the essential issue of the contributions to be made by Patel or the amount of any share to be received by Patel in the Bridgeport project. While Patel urges this court to adopt the same split that the parties agreed to with regard to the New Haven project, there is no basis for so doing. The terms of one contract do not determine the terms of a separate and distinct transaction. The evidence indicates that while Patel and Barot were eventually able to reach agreement on essential terms of an agreement concerning the New Haven project, they never did reach such an agreement with regard to the Bridgeport project.
This court has no doubt that plaintiff Patel firmly believes that he is entitled to half of any profits that the defendants may ultimately receive from the Father Panik Replacement Housing project. The firmness of his belief does not, however, establish that there was ever any actual meeting of the minds on the essential issue of Patel's share. Patel, who testified in an evasive and often self-contradictory manner, was extremely impressed with his own abilities and appears to have regarded his behind-the-scenes machinations as far more influential than they may in fact have been. Indeed, Patel seems to have mistaken his own desires and assumptions for agreements by others. Before winning preferred developer status, Barot and CCH-Florida did not commit to any specific arrangement with Patel, left open the essential term of the amount of any share for Patel, and then did not agree with Patel's proposals to share equally or to other definite extent in profits. Both Patel and Barot behaved in an evasive and indirect manner, and they used and manipulated each other without ever reaching an agreement as to essential terms of their relationship.
The plaintiffs have failed to prove by a preponderance of the credible evidence that agreement was ever reached on the essential terms of any joint venture or other agreement, and their claim therefore fails. CT Page 15561
Conclusion
Judgment shall enter in favor of the defendants. The defendants shall recover their statutory court costs upon application to the clerk of the court.
 ___________________ Beverly J. Hodgson Date Judge of the Superior Court