## WILLOW FUNDING COMPANY, L.P. *v.* GRENCOM ASSOCIATES ET AL.
### (AC 20489)

Foti, Flynn and Peters, Js.

Argued April 2—officially released June 19, 2001

*Richard L. Albrecht*, with whom were *Jonathan S. Bowman* and, on the brief, *Barbara M. Schellenberg*, for the appellant (plaintiff).

*Matthew J. Forstadt*, with whom was *John A. Farnsworth*, for the appellees (defendants).

*Opinion*

PETERS, J. This is a foreclosure action to enforce a note and a second mortgage purchased, through sealed bid, from the Federal Deposit Insurance Corporation. In light of the mortgagor's acknowledged default on the note and mortgage, the trial court granted the plaintiff's motion for foreclosure by sale.[1] The court, however, reduced the amount of the loan secured by the mortgage so as to reflect, inter alia, the mortgagee's conduct with respect to an oral executory refinancing agreement that never came to full fruition.[2] The principal issue is whether the court, in deciding that the mortgagee had sought equitable relief with unclean hands, placed excessive emphasis on the refinancing agreement and improperly declined to apply the statute of frauds, Gen-

---

[1] The mortgagor originally sought a strict foreclosure, but subsequently agreed to a foreclosure by sale.

[2] In its judgment, the court held, on three independent grounds, that the mortgagee was not entitled to enforce its mortgage in full. It concluded that the mortgagee had (1) violated the fiduciary duty that it owed to the mortgagor, (2) violated the clean hands doctrine and (3) usurped a business opportunity that belonged to the mortgagor. Our affirmance rests only on the clean hands doctrine.

eral Statutes § 52-550.[3] We are persuaded that the facts found by the court sustain the manner in which it exercised its equitable discretion over a foreclosure action.

# I

## PROCEDURAL HISTORY

This case is the second round of litigation concerning the efforts of the plaintiff, Willow Funding Company, L.P., as successor mortgagee, to foreclose a mortgage that secured a promissory note executed by the named defendant, Grencom Associates (Grencom). Grencom is a partnership. The note was guaranteed, in part, by the defendants Arthur Collins and Arthur Emil, who are the sole partners in the partnership.

The first round of litigation focused on whether the plaintiff had adduced sufficient evidence to prove the amount of the indebtedness for which the defendants could be held accountable. Our Supreme Court concluded "that the defendants' admissions sufficed to satisfy the plaintiff's burden of proof with respect to the defendants' indebtedness." *Willow Funding Co., L.P.* v. *Grencom Associates*, 246 Conn. 615, 623, 717 A.2d 1211 (1998) (*Willow Funding Co., L.P., I*). That court

[3] General Statutes § 52-550 provides: "(a) No civil action may be maintained in the following cases unless the agreement, or a memorandum of the agreement, is made in writing and signed by the party, or the agent of the party, to be charged: (1) Upon any agreement to charge any executor or administrator, upon a special promise to answer damages out of his own property; (2) against any person upon any special promise to answer for the debt, default or miscarriage of another; (3) upon any agreement made upon consideration of marriage; (4) upon any agreement for the sale of real property or any interest in or concerning real property; (5) upon any agreement that is not to be performed within one year from the making thereof; or (6) upon any agreement for a loan in an amount which exceeds fifty thousand dollars.

"(b) This section shall not apply to parol agreements for hiring or leasing real property, or any interest therein, for one year or less, in pursuance of which the leased premises have been or are actually occupied by the lessee, or any person claiming under him, during any part of the term."

remanded the case for a new trial to consider the merits of the defendants' counterclaim and their special and affirmative defenses.[4] Id., 625.

The second round of litigation deals solely with the viability of the defendants' counterclaims and defenses.[5] After a trial to the court, the court found that the plaintiff could not recover in full because of its violation of the clean hands doctrine. The court also found in favor of the defendants on their other defenses and counterclaims.[6] As a result, the court exercised its equitable discretion to reduce the amount of the secured debt to $932,877.25 plus attorney's fees.[7]

On appeal, the plaintiff challenges each of the court's adverse rulings.[8] We need not, however, consider all of these claims if we conclude that the defendants have proven any of their special defenses or counterclaims. We have, therefore, focused our attention on the sustainability of the court's ruling with respect to the issue of unclean hands. We affirm the judgment on that basis.

II

FINAL JUDGMENT

Before we discuss the merits of the plaintiff's appeal, we must determine whether the appeal is properly

[4] Pursuant to General Statutes § 51-183c, Judge Tierney heard the case on remand. He had no prior exposure to this case.

[5] As special defenses and counterclaims, the defendants claimed, inter alia, that (1) the plaintiff should be denied a remedy due to its unclean hands, (2) the plaintiff breached its fiduciary duty, (3) the plaintiff usurped Grencom's business opportunity and (4) the plaintiff breached its implied covenant of good faith and fair dealing with Grencom.

[6] The defendants also sought, belatedly, to amend their counterclaims to include a claim under the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. The court denied them permission to do so. The defendants have not pursued this issue in this court.

[7] In furtherance of the court's order of foreclosure by sale, it also awarded $4700 to the plaintiff as an appraisal fee.

[8] The plaintiff does not challenge the computation of the reduction of the indebtedness.

before us. As a matter of first impression, we must decide whether a judgment ordering a foreclosure by sale is appealable before the court has set a date for the foreclosure to take place.

Although the parties did not raise this question, we are required to consider it. "It is axiomatic that, except insofar as the constitution bestows upon [an appellate court] jurisdiction to hear certain cases; see *Fonfara* v. *Reapportionment Commission*, 222 Conn. 166, 610 A.2d 153 (1992); the subject matter jurisdiction of the Appellate Court and of [the Supreme Court] is governed by statute. *Grieco* v. *Zoning Commission*, 226 Conn. 230, 231, 627 A.2d 432 (1993). It is equally axiomatic that, except insofar as the legislature has specifically provided for an interlocutory appeal or other form of interlocutory appellate review; see, e.g., General Statutes § 52-278*l* (prejudgment remedies); General Statutes § 54-63g (petition for review of bail); General Statutes § 51-164x (court closure orders); *State* v. *Ayala*, 222 Conn. 331, 340, 610 A.2d 1162 (1992); appellate jurisdiction is limited to final judgments of the trial court." (Internal quotation marks omitted.) *Conetta* v. *Stamford*, 246 Conn. 281, 289–90, 715 A.2d 756 (1998); *Waterbury Teachers Assn.* v. *Freedom of Information Commission*, 230 Conn. 441, 447, 645 A.2d 978 (1994).

We have found only a few analogous cases to guide our resolution of this issue. In *Paranteau* v. *DeVita*, 208 Conn. 515, 523, 544 A.2d 634 (1988), our Supreme Court held that "a judgment on the merits is final for purposes of appeal even though the recoverability or amount of attorney's fees for the litigation remains to be determined." The bright line rule articulated in *Paranteau* was later extended to permit an immediate appeal from a judgment of strict foreclosure in which attorney's fees remained to be determined. *Benvenuto* v. *Mahajan*, 245 Conn. 495, 501, 715 A.2d 743 (1998). In coming to that conclusion, the *Benvenuto* court exam-

ined and disagreed with a contrary result reached by this court in *Connecticut National Bank* v. *L & R Realty*, 40 Conn. App. 492, 494–95, 671 A.2d 1315 (1996). *Benvenuto* v. *Mahajan*, supra, 500.

To answer the final judgment question in this case, we must first consider whether any part of our jurisdictional rulings in *Connecticut National Bank* survives after *Benvenuto*. In our decision that a strict foreclosure judgment was not appealable before the setting of law dates, we acted on two independent grounds. We held that the appeal was premature, first because the judgment did not address attorney's fees and second because the judgment did not set law days for redemption of the mortgage. *Connecticut National Bank* v. *L & R Realty*, supra, 40 Conn. App. 494–95. On the first, *Benvenuto* is dispositive. On the second, however, the *Benvenuto* decision does not give us clear instructions. *Benvenuto* v. *Mahajan*, supra, 245 Conn. 500–501.

*Benvenuto* thus leaves *Connecticut National Bank* under a cloud of uncertainty. At the least, however, *Benvenuto* counsels against an expansive reading of our case. If, as *Benvenuto* holds, piecemeal appeals are appropriate in strict foreclosure actions, they should be equally appropriate in cases of foreclosure by sale.

The conclusion, following *Benvenuto*, that foreclosure judgments are often appealable immediately is reinforced by a comparison of the function of law days in strict foreclosures with the function of dates for foreclosures by sale. Until law days are set, "the parties' rights remain unconcluded . . . [and] a strict foreclosure judgment . . . cannot be final . . . ." *Connecticut National Bank* v. *L & R Realty*, supra, 40 Conn. App. 494. Such consequences do not attend the failure to set a date for the implementation of a judgment for a foreclosure by sale. Rights to redemption are not cut off by a foreclosure sale. "[S]uch rights survive the

auction of the foreclosed property and may be exercised until such time as the judicial authority approves the foreclosure sale." *Washington Trust Co.* v. *Smith*, 241 Conn. 734, 742, 699 A.2d 73 (1997); see *Raymond* v. *Gilman*, 111 Conn. 605, 613, 151 A. 248 (1930); see also *In the Matter of Loubier*, 6 B.R. 298, 303 (D. Conn. 1980); D. Caron, Connecticut Foreclosures (2d Ed. 1989 & Sup. 1995-96) § 9.02B, p. 150. As best we can ascertain, no Connecticut appellate case has held that appellate review of judgments of foreclosure must await the setting of a date for a foreclosure sale.[9] We conclude, therefore, that this appeal is properly before this court.

## III

## MERITS OF THE APPEAL

Turning now to the merits of the plaintiff's appeal, we start with a statement of the essential facts described in *Willow Funding Co., L.P., I.* "This case arises out of successive assignments of a mortgage debt. On June 13, 1988 . . . Grencom . . . executed a note for $1,500,000, payable to Citytrust. The note was secured by a second mortgage on real estate in Greenwich. The defendants Arthur Collins and Arthur D. Emil became guarantors of Grencom's debt. The defendants did not repay the loan when it matured on June 15, 1991. Shortly afterward, Citytrust failed, and the Federal Deposit Insurance Corporation (FDIC) became its receiver. The FDIC hired Consolidated Asset Recovery Corporation [CARC] to service the Grencom loan. The plaintiff, Willow Funding Company, L.P., purchased the loan under sealed bid as part of a pool of loans. Accordingly, on December 6, 1994, the FDIC endorsed the note and

---

[9] It is possible that all of the issues on appeal can be reached as part of the judgment upholding the defendants' counterclaims. Pursuant to Practice Book § 61-2, a judgment rendered on an entire counterclaim is a final judgment. Going that route would, however, require us to determine the extent to which the defendants' defenses and counterclaims raise the same issues. We prefer to reach the merits directly.

assigned the mortgage to the plaintiff. On May 19, 1995, the plaintiff commenced this foreclosure action." *Willow Funding Co., L.P., I,* supra, 246 Conn. 617–18.

After a second trial to the court, the court concurred in the earlier finding of default on the Citytrust note and mortgage. Although the default established the plaintiff's right to foreclosure, further evidence at this trial persuaded the court, in the exercise of its equitable discretion, to reduce the amount of the defendants' indebtedness and, correlatively, the plaintiff's recovery.

One ground for the court's conclusion was that the defendants had sustained their affirmative defense of unclean hands. "The doctrine of unclean hands expresses the principle that where a plaintiff seeks equitable relief, he must show that his conduct has been fair, equitable and honest as to the particular controversy in issue. . . . Unless the plaintiff's conduct is of such a character as to be condemned and pronounced wrongful by honest and fair-minded people, the doctrine of unclean hands does not apply." (Citation omitted.) *Bauer* v. *Waste Management of Connecticut, Inc.,* 239 Conn. 515, 525, 686 A.2d 481 (1996).

The court concluded that the doctrine of unclean hands was applicable because of the plaintiff's conduct with respect to an oral agreement between the parties for renegotiation of the terms of the Citytrust note and mortgage. The court found that the plaintiff had bypassed the oral agreement to avail itself of the opportunity to obtain the Citytrust note and mortgage from CARC, an opportunity to which it was first alerted by the defendants. The plaintiff's purchase of the Citytrust note and mortgage from CARC was the basis for the plaintiff's claim that its foreclosure action should reflect the defendants' original debt of $1,500,000 on the note and mortgage, rather than a debt of $865,000 to which the plaintiff had agreed orally on October 3, 1994.

The plaintiff does not take issue with the clean hands doctrine itself, but argues that the court misapplied the doctrine in this case. The plaintiff claims that the court improperly found that the parties had reached an oral agreement. If we disagree with that claim, the plaintiff asserts that the agreement was unenforceable because it was not sufficiently definite and because, in the absence of supporting documentation, it did not comply with the statute of frauds. General Statutes § 52-550. We disagree.

Standard rules of appellate procedure confine our review of the court's findings of fact to a determination of whether they were clearly erroneous, but require us to undertake plenary review of claims of law. See, e.g., *Napoletano* v. *CIGNA Healthcare of Connecticut, Inc.*, 238 Conn. 216, 232–33, 680 A.2d 127 (1996), cert. denied, 520 U.S. 1103, 117 S. Ct. 1106, 137 L. Ed. 2d 308 (1997); *Pandolphe's Auto Parts, Inc.* v. *Manchester*, 181 Conn. 217, 221–22, 435 A.2d 24 (1980); *Lux* v. *Environmental Warranty, Inc.*, 59 Conn. App. 26, 31, 755 A.2d 936, cert. denied, 254 Conn. 949, 762 A.2d 902 (2000); see Practice Book § 60-5.

The court found the following undisputed facts. The FDIC, in order to dispose of mortgages originally owned by Citytrust, appointed CARC to conduct an auction of the mortgages on behalf of the FDIC. In 1994, Grencom arranged with CARC to reduce its indebtedness to $500,000 if Grencom could pay that amount in cash. CARC required Grencom to make this payment by October 31, 1994, or risk sale of the note and mortgage, at public auction, to an unknown third party who had submitted the most favorable sealed bid. To meet this deadline, Grencom, through the assistance of an intermediary, sought funding from the plaintiff.

The plaintiff and the defendants then entered into oral negotiations. The plaintiff disputes that those nego-

tiations resulted in a refinancing agreement to which both parties subscribed on October 3, 1994. In support of its finding that there was such an agreement, the court noted that the plaintiff had made a site inspection and had received extensive documentation of Grencom's financial status. Some of these documents were not available to the general public. The court found that this documentation, supplemented by a site inspection, had given the plaintiff access to all that it needed to make an underwriting decision about whether to make a loan to Grencom.

As further evidence of a refinancing agreement, the court found that, in the refinancing agreement, the plaintiff had agreed to lend to Grencom $700,000,[10] the sum that the defendants had requested, as well as an additional sum of $165,000.[11] The new loan of $865,000 was to be secured by a new second mortgage in substitution for the Citytrust note and mortgage, and by personal guarantees from Collins and Emil. The parties had agreed that the guarantees were to take the form of springback guarantees, pursuant to which the guarantors would be discharged from liability if, upon default of the new loan, Grencom executed, in favor of the plaintiff, a deed that would obviate the need to pursue a foreclosure action.

In furtherance of finding that there was a refinancing agreement, the court found that Grencom had paid $5000 to the plaintiff. The plaintiff had received this sum so that it would prepare the required closing documents, the mortgage and the guarantees. With the exception of a proposed rider for the springback guarantees, the plaintiff failed to provide Grencom with any of the required papers.

[10] That sum represented the $500,000 that Grencom would pay to CARC, as well as an additional amount of $200,000 for building improvements.

[11] The plaintiff maintains that this payment was for unpaid interest. The parties characterized it as "vig."

The court also examined the circumstances surrounding the plaintiff's purchase of the Citytrust note and mortgage through a sealed bid tendered at the CARC public auction. The court found that the plaintiff had been unaware of the pending auction until the subject came up in a conversation with the defendant Collins. The plaintiff thereafter asked for and was granted permission to obtain further information from the CARC. Collins voiced no objection, reasonably expecting that the refinancing agreement would continue to be in effect even if the plaintiff acquired the Citytrust note and mortgage at the public auction.

Contrary to the defendants' expectations, the plaintiff, after becoming the successful bidder,[12] sought to hold the defendants liable for the full amount of the Citytrust note and mortgage. The plaintiff proposed, and the defendants rejected, a different and less favorable refinancing plan. This foreclosure action ensued.

### A

The first issue raised in the plaintiff's appeal is a claim that the court's findings of fact were clearly erroneous and the finding of unclean hands was thereby improper. This claim of error focuses on the court's finding that, on October 3, 1994, the parties reached a binding agreement for the refinancing of the defendants' obligations arising out of the Citytrust note and mortgage. The plaintiff concedes that "[a]t some point the

---

[12] The plaintiff paid $382,658.26 to acquire the mortgage. The court properly noted that it was irrelevant to the present inquiry that there was a considerable discrepancy between that sum and the amount that the plaintiff sought to receive as assignee of the Citytrust note and mortgage.

The court further found that the plaintiff's bid was improper because the plaintiff's receipt of private information from the defendants, before the auction, violated a confidentiality agreement to which the plaintiff had subscribed as a condition to receiving the bid package from CARC. That finding, too, is irrelevant because the defendants have not claimed a right to enforce the confidentiality agreement.

parties negotiated [the] general terms of a loan." That concession, according to the plaintiff, did not provide evidence of a binding contractual engagement because, in its view, the parties had not yet defined essential terms of the contemplated springback guarantees on which the contemplated refinancing depended.

Dealing with this issue as a question of fact, we note that the record supports the court's finding that the parties had reached an oral agreement. The plaintiff's chief negotiator testified that the plaintiff had itself proposed the deal that the defendants had accepted. The deal included the promise of springback guarantees by Collins and Emil that were designed to conform to specifications set by the plaintiff. We are persuaded that the court's finding of fact is not clearly erroneous.

Dealing with this issue as a question of law, we consider the plaintiff's argument that the agreed upon general terms could not have become a binding agreement because some aspects of these terms had not yet been agreed upon by October 3, 1994. The plaintiff attaches great significance to postagreement discussions about the springback guarantees. We do not doubt that acceptable guarantees were essential features of the refinancing agreement, but we disagree that these guarantees were too indefinite to be enforceable.

Our contract law is not as constricted as the plaintiff assumes it to be. The plaintiff assumes that a court is precluded from finding the existence of an enforceable agreement if (1) the parties engaged in further negotiations subsequent to the time of the agreement or (2) the essential terms of the agreement have not been fully spelled out at the time of the agreement. We are not persuaded.

The fact that parties engage in further negotiations to clarify the essential terms of their mutual undertakings does not establish the time at which their undertakings

ripen into an enforceable agreement. The plaintiff cites no authority, and we have found none, that assigns so draconian a consequence to a continuing dialogue between parties that have agreed to work together. We know of no authority that precludes contracting parties from engaging in subsequent negotiations to clarify or to modify the agreement that they had earlier reached.[13]

More important, we agree with the trial court that the general terms on which the parties indisputably had agreed by October 3, 1994, included all the terms that were essential to an enforceable agreement. Under the modern law of contract, if the parties so intend, they may reach a binding agreement even if some of the terms of that agreement are still indefinite. See *Meaney* v. *Connecticut Hospital Assn., Inc.*, 250 Conn. 500, 521, 735 A.2d 813 (1999); *O'Sullivan* v. *Bergenty*, 214 Conn. 641, 651–52, 573 A.2d 729 (1990). As Professor E. Allan Farnsworth has noted, courts increasingly have been willing to flesh out the intended meaning of indefinite contract language by recourse to trade custom, standard usage and past dealings. 1 E. Farnsworth, Contracts (2d Ed. 1998) § 3.28, p. 398; cf. General Statutes §§ 42a-2-204 and 42a-2-208. Section 42a-2-204 expressly recognizes that, if the parties so intend, they may reach a binding agreement "[e]ven though one or more terms are left open . . . ."

We do not mean to suggest that contemplated contractual undertakings are enforceable no matter how

---

[13] Similarly, we are unaware of any binding authority that would support the plaintiff's argument that it could not have entered into an enforceable agreement prior to completing its financial investigation of Grencom. Had that investigation led the plaintiff to determine that the financing agreement was not financially feasible, the plaintiff might well have been excused from further performance of the parties' agreement. See 2 Restatement (Second), Contracts §§ 224 and 237 (1981). Such an excuse would have been relevant to an assessment of the remedial rights of the parties, but it is irrelevant to an inquiry into whether the parties previously had entered into a binding contractual agreement.

indefinite the agreement may be. As the plaintiff points out, numerous Connecticut cases require definite agreement on the essential terms of an enforceable agreement. We agree with the plaintiff that an agreement is too indefinite to be enforceable until the parties have decided the amount of a contemplated loan; *Suffield Development Associates Ltd. Partnership* v. *Society for Savings*, 243 Conn. 832, 843, 708 A.2d 1361 (1998); or the configuration of a subordination agreement. *L & R Realty* v. *Connecticut National Bank*, 53 Conn. App. 524, 537–38, 732 A.2d 181, cert. denied, 250 Conn. 901, 734 A.2d 984 (1999). Similar examples abound. They turn, however, on the particular circumstances of each case.

We must decide, therefore, whether, on October 3, 1994, there remained significant unresolved issues about the essential terms of the guarantees that Collins and Emil had agreed to provide to the plaintiff. Essential terms might well be deemed to have been missing in this case if the parties had not determined the identity of the guarantors, the amount of the debt to be underwritten, the time period for which the guarantees would be operative, or the overall form that the guarantees would take. These essential terms, however, had all been made definite by October 3, when the plaintiff, in return for the defendants' payment of $5000, undertook to draft the documents needed to implement the agreement of the parties.[14]

What remained indefinite, according to the plaintiff, were the details of the springback guarantees, to which the plaintiff concededly had agreed in concept. We disagree that the absence of such details made the agreement unenforceable. In our view, a failure of total definition does not import intolerable ambiguity even

---

[14] The plaintiff does not contest his receipt of $5000 from the defendants for this purpose.

into terms that are essential to the formation of an enforceable agreement. The parties might, of course, have postponed the effective date of the agreement. The court found to the contrary.[15]

The propriety of the court's finding is not undercut by testimony that the defendant Emil, after October 3, 1994, refused to agree to certain aspects of the plaintiff's proposals with respect to the guarantees. It is not clear whether the plaintiff was belatedly asking for more extensive guarantees than previously contemplated or whether Emil's conduct was in breach of the October 3 agreement. In either event, we are not persuaded that disagreement about some aspect of the performance contemplated by the October 3 agreement is inconsistent with a determination that the parties had come to such an agreement, in general terms, on October 3, 1994.

We therefore affirm the court's decision with respect to the parties' mutual understandings on October 3, 1994. The court's finding of fact in that regard was not clearly erroneous. The court's conclusion that the agreement was sufficiently definite to permit it to have legal consequences was proper. Under common-law principles of contract formation, the plaintiff cannot prevail.

B

The plaintiff argues that even if the parties reached an agreement on the terms of their mutual undertaking on October 3, 1994, the applicable provision of the statute of frauds bars enforcement of the agreement. The agreement was never memorialized in writing. General Statutes § 52-550 (a) provides in relevant part: "No civil action may be maintained in the following cases unless the agreement, or a memorandum of the agreement, is

---

[15] The court's finding may well have reflected its understanding of the time pressure for an early refinancing agreement that was created by the October 31, 1994 deadline set by CARC.

made in writing and signed by the party, or the agent of the party, to be charged . . . (6) upon any agreement for a loan in an amount which exceeds fifty thousand dollars." In this case, the oral agreement contemplated a loan of more than $500,000.

The court concluded that the statute of frauds did not bar its consideration of the parties' oral agreement as part of its overall assessment of whether the plaintiff was entitled to the equitable relief that it sought. First, the court noted that § 52-550 governs only a "civil action" to enforce the contract. In this case, the court held that the underlying action brought by the plaintiff was not a "civil action." Second, the court held that the defendants did not premise their claims for reduction of their indebtedness on the enforceability of the October 3, 1994 agreement.

Without challenging the court's factual findings, except as noted earlier in this opinion, the plaintiff renews its claim that the statute of frauds precludes the defendants from succeeding on any of their defenses. In the absence of case law construing subdivision (6) of subsection (a) of § 52-550, we will assume, as have the parties, that it is appropriate to apply this subdivision in accordance with the limitations and caveats that have been engrafted on other subdivisions of § 52-550 (a).

The plaintiff cites *Simons* v. *New Britain Trust Co.*, 80 Conn. 263, 267, 67 A. 883 (1907), and *DiBlasi* v. *DiBlasi*, 114 Conn. 539, 543, 159 A. 477 (1932), in support of its argument. These cases hold, inter alia, that neither a plaintiff nor a defendant can maintain a claim that runs afoul of the statute of frauds. They hold that the statute of frauds disallows defenses that seek to *enforce* an otherwise valid oral agreement.

The defendants argue persuasively that these cases are inapplicable in light of the defendants' pleadings. Although the defendants' pleadings allege unfair con-

duct by the plaintiff, the defendants argue that those pleadings contain no claims whatsoever for enforcement of the oral agreement between the parties. The defendants did not file any claims for affirmative relief under the agreement, such as a request for specific performance or for damages for breach of contract. The court agreed with the defendants.

The statute of frauds cannot be avoided by verbal manipulation. That is not the case here. After the public auction, there was no further opportunity for refinancing, so that a claim for specific performance, if available, would have been futile. A claim for damages would have required a quantification of injury that the defendants would have been hard pressed to make. There were, therefore, substantive reasons for the defendants to seek a remedy only through equitable reduction of their debt. These reasons equally refute the plaintiff's claim that the court's decision was premised on enforcement of the oral agreement between the parties, in violation of the statute of frauds.

The plaintiff appears also to argue that, in the absence of enforcement of the oral agreement, the court had no authority to consider the conduct of the parties with respect to that agreement. Whatever the force of that argument may be under other circumstances, we know of no authority that makes such conduct irrelevant to a court's exercise of its equitable discretion in a foreclosure proceeding. Our review of the record persuades us that it was proper for the court to consider the conduct of the plaintiff with respect to the oral agreement for evidentiary purposes.

Speaking more broadly, we are persuaded that the court's invocation of equitable principles in this case is sustainable even if we were to take the plaintiff's view of the statute of frauds issue, premised on the wording of that statute. Our courts have been assiduous

to prevent the statute of frauds from becoming an instrument of fraud. See, e.g., *Blakeslee* v. *Water Commissioners*, 121 Conn. 163, 186, 183 A. 887 (1936); *Milazzo* v. *Schwartz*, 44 Conn. App. 402, 406, 690 A.2d 401, cert. denied, 240 Conn. 926, 692 A.2d 1282 (1997).

Although this case has no allegation or finding of fraud, the record contains adequate findings of misconduct to support the court's conclusion that equitable principles warrant a reduction in the defendants' debt. A party that invokes a court's equitable jurisdiction by filing an action for foreclosure necessarily invites the court to undertake such an inquiry. See *Reynolds* v. *Ramos*, 188 Conn. 316, 320, 449 A.2d 182 (1982); *Southbridge Associates, LLC* v. *Garofalo*, 53 Conn. App. 11, 15, 728 A.2d 1114, cert. denied, 249 Conn. 919, 733 A.2d 229 (1999).

The record discloses that the plaintiff not only failed to honor the parties' oral agreement, but it did not inform the defendants of its decision in a timely fashion. It never prepared the documentation that it had been paid to produce. As a result of the plaintiff's inaction, the defendants were foreclosed, for all practical purposes, from complying with the CARC's deadline for favorable refinancing. The plaintiff, on the other hand, availed itself of a more profitable public auction, an opportunity of which it would not had known but for information received from one of the defendants. Relying on its successful bid at that auction, the plaintiff succeeded in escalating its financial demands on the defendants. This record supports the court's conclusion that, in this case, equitable principles warranted a reduction in the amount that the plaintiff was entitled to recover. See *Olean* v. *Treglia*, 190 Conn. 756, 771, 463 A.2d 242 (1983); *Rutt* v. *Roche*, 138 Conn. 605, 609–10, 87 A.2d 805 (1952).

Just as a party's invocation of the statute of limitations may be converted, in equity, into the more flexible

doctrine of laches; see, e.g., *Dunham* v. *Dunham*, 204 Conn. 303, 326–27, 528 A.2d 1123 (1987); so we hold that the statute of frauds, in equity, may in proper circumstances be converted into a more flexible inquiry into an equitable remedy that reflects a weighing of the rights of the parties. What makes this case an appropriate candidate for flexibility is that the plaintiff does not deny that the parties had agreed on the general terms of their undertaking. The statute of frauds was principally designed to prevent imposition of liability on the basis of swearing contests about the alleged relationship between the parties. That simply is not the case here.

Our conclusion is consistent with generally acknowledged doctrines that have justified noncompliance with the statute of frauds. In *O'Sullivan* v. *Bergenty*, supra, 214 Conn. 648–51, our Supreme Court held that the doctrine of equitable estoppel could excuse such noncompliance. We see no persuasive distinction between that case and this case, in which a plaintiff invokes equitable jurisdiction, and equitable discretion, when the plaintiff itself was responsible for the absence of the documentation that it now claims to have been essential.

We conclude that the statute of frauds furnishes no relief to the plaintiff under the circumstances of this case. The court properly so ruled.

IV

CONCLUSION

We affirm the court's overall conclusion that the plaintiff came to the court with unclean hands and therefore was not entitled to full enforcement of the Citytrust note and mortgage. The plaintiff does not challenge the basic proposition that the court, in light of its equitable jurisdiction over foreclosure actions, had

the authority to take into account the totality of the evidence presented to it. It does not question the validity of the court's exercise of its equitable discretion except to question the propriety of the court's reliance on an oral agreement between the parties and its disregard of the statute of frauds. At the end of the day, the court's judgment in favor of the defendants was primarily based on a fact-bound balancing of the equities. We do not lightly set such a judgment aside.

The judgment is affirmed.

In this opinion the other judges concurred.