## 111 WHITNEY AVENUE, INC., ET AL. *v.* COMMISSIONER OF MENTAL RETARDATION
## (AC 21803)

Mihalakos, Flynn and Peters, Js.

---

[6] See footnote 1.

Argued April 23—officially released July 2, 2002

*David S. Doyle*, for the appellant (plaintiffs).

*Sean C. Connors*, with whom, on the brief, was *Mark A. Milano*, for the appellee (defendant).

*Opinion*

PETERS, J. Pursuant to a consent decree, the department of mental retardation undertook to find community group homes to replace institutional housing for adults with mental retardation. To this end, various state officials communicated with potential private investors to encourage them to underwrite the development of suitable group homes. The dispositive issue in this case is whether the plaintiff investors have proved that these communications matured into an enforceable oral agreement containing a guarantee of an uninterrupted income flow for at least ten years. The investors appeal from the trial court's judgment in favor of the defendant, which was based on the court's finding that the investors had failed to prove the essential terms of their alleged oral contract. We affirm the judgment of the trial court.

The plaintiffs, 111 Whitney Avenue, Inc., and Gaynor/111 Whitney Avenue Partnership, filed a complaint against the defendant commissioner of mental retarda-

tion. They alleged that the defendant, in an oral agreement, had induced them to invest in premises suitable for group homes by guaranteeing that the homes would be properly staffed and occupied for a ten year period. The plaintiffs sought to recover damages to compensate them for losses resulting from the default by a state licensed service provider and the consequent removal of the group home residents from the premises in which the plaintiffs had invested.

The defendant agreed that personnel from the department of mental retardation (department) had met with representatives of the plaintiffs to discuss group homes for the mentally retarded. He denied that these conversations had led to a binding oral agreement. He further denied that department personnel had in any way implied or promised the plaintiffs that group homes would house clients for any specific number of years. In addition, he pleaded the statute of frauds as an affirmative defense.[1]

The trial court found that the plaintiffs had failed to satisfy their burden of proving the essential terms of their alleged oral contract with the defendant. The court identified three essential terms that had not been proven: the identity of the parties; the terms of their mutual understanding; and the authority of the state agents with whom the plaintiffs allegedly dealt to enter into engagements that were binding on the defendant. In the absence of proof of these essential terms, the court also sustained the state's affirmative defense under the statute of frauds. For these reasons, it rendered judgment in favor of the defendant.

---

[1] The defendant also raised two additional special defenses that are not a part of this appeal. One special defense alleged that the plaintiffs had unclean hands. Another alleged that the plaintiffs had failed to state a claim upon which relief could be granted. This special defense involved a claim of sovereign immunity, which the trial court rejected.

The court's memorandum of decision and the record provide the factual background for this litigation. In the late 1980s and the early 1990s, the plaintiffs and other related partnerships entered into written leases for the development of group homes for mentally retarded adults in New Haven and in Litchfield. Various state agents encouraged such investments in order for the state to comply with a 1984 decree of the United States District Court for the District of Connecticut concerning the housing needs of mentally retarded persons.

The state was heavily engaged in implementing its plan for group homes. State agencies strictly reviewed all phases of licensing, development and construction. The state designated and monitored the service providers for the group homes. The state required that leases between an investor and a service provider run for a ten year term in order to provide a stable environment for those living in the group homes. By contrast, its contracts with service providers had a duration of only one year.

When the plaintiffs learned of this investment opportunity, they decided to invest in the development of three group homes.[2] For all three properties, the service provider was an entity known as NCDC of Connecticut (NCDC), which obtained proper licenses from the defendant. In mid-August, 1991, the plaintiffs entered into written real estate leases with NCDC for the group homes that they owned. The plaintiffs had no written agreements with the defendant. The court noted that "[b]y design there was no direct contract between the plaintiffs and the defendant."

The plaintiffs' investments soured when NCDC defaulted on its obligations, including the rental pay-

[2] The plaintiffs invested in two group homes in New Haven and one group home in Litchfield. All these homes were operated by the same service provider.

ments it owed to the plaintiffs. The defendant did not replace NCDC by licensing another service provider to run the group homes in which the plaintiffs had invested and moved the group home residents to other facilities. The plaintiffs base their claim for relief from this adverse event on the defendant's failure to honor his alleged contractual duty to replace NCDC with another service provider for ten years.

The plaintiffs alleged that they had reached an oral agreement with the defendant about their development of group homes in two ways. One way was a verbal agreement with the defendant's agent. The other way was by acceptance of a general offer made by state agents, in telephone calls, meetings and correspondence, that described the group homes plan that the state was promoting.

First, the plaintiffs argue that the defendant was bound by a verbal agreement that they allegedly had reached with Antoinette Richardson some time in the first quarter of 1989. Richardson was the defendant's director for Region One (the northwestern part of the state).[3] The principal term of this alleged contract was a promise by the defendant, upon the default of a service provider or the removal of a group home resident, to find substitute providers or residents for a ten year period. No written memorandum of this meeting was ever prepared. Richardson did not recall any meeting of that sort. To the contrary, she stated that, in all her discussions with individuals, she had emphasized that there were no guarantees.

Second, the plaintiffs argue that an enforceable contract arose out of their acceptance of the defendant's general offer to any potential group home investor that the department would guarantee the operation of such a home for a period of ten years. At trial, they introduced

---

[3] None of the plaintiffs' properties was located in Region One.

written statements and telephone logs to substantiate their claim that the defendant had made an offer that they had accepted by making their investments. The existence of these communications and their availability to the plaintiffs are undisputed.

The trial court rejected the plaintiffs' contention that they were entitled to recover. Its principal finding was that the plaintiffs had failed to prove the existence of any contractual relationship between the parties. In this appeal, the plaintiffs argue that, to the contrary, the evidence at trial sufficiently demonstrated each of the building blocks for an enforceable agreement.

Our review of the plaintiffs' claims starts from the established proposition that a question about the existence of a contract is a question that must be decided by the finder of facts. *Pagano* v. *Ippoliti*, 245 Conn. 640, 654, 716 A.2d 848 (1998); *L & R Realty* v. *Connecticut National Bank*, 53 Conn. App. 524, 534, 732 A.2d 181, cert. denied, 250 Conn. 901, 734 A.2d 984 (1999); *Fortier* v. *Newington Group, Inc.*, 30 Conn. App. 505, 509, 620 A.2d 1321, cert. denied, 225 Conn. 922, 625 A.2d 823 (1993). It follows that the plaintiffs' appeal can succeed only if the court's findings were clearly erroneous. "A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. In applying the clearly erroneous standard to the findings of a trial court, we keep constantly in mind that our function is not to decide factual issues de novo. Our authority, when reviewing the findings of a judge, is circumscribed by the deference we must give to decisions of the trier of fact, who is usually in a superior position to appraise and weigh the evidence." (Internal quotation marks omitted.) *Doyle* v. *Kulesza*, 197 Conn. 101, 105, 495 A.2d 1074 (1985); *Place* v. *Waterbury*, 66 Conn. App. 219, 222, 783 A.2d 1260 (2001); see also Practice Book § 60-5.

## I

We review separately each of the reasons adduced by the trial court for its finding that a contractual relationship had not been proven. The court found that the plaintiffs had failed to prove three essential terms of their alleged contract. This finding was not clearly erroneous.

## A

### Identities of the Parties

The trial court found that the plaintiffs had failed to identify the parties to such an undertaking. "[T]o form a contract . . . the identities of the contracting parties must be reasonably certain." (Citations omitted.) *Ubysz* v. *DiPietro*, 185 Conn. 47, 51, 440 A.2d 830 (1981).

The court focused on the alleged conference with Richardson in early 1989. At that time, only one of the three investment partnerships had been formed. The plaintiffs' principal witness, Edward Marcus, did not testify when, if ever, in his conversations with Richardson, or with any other state agent, he differentiated between his role as potential investor and his role as attorney for other potential investors. As the court noted, in his correspondence with an assistant attorney general, written on his law firm's stationery, he identified himself as representing "a group" not otherwise identified.

The plaintiffs respond that they were sufficiently represented at the alleged conference with Richardson by the presence of two of their partners, Marcus and Mark Gaynor. They do not claim that Marcus or Gaynor informed Richardson of the identity of their fellow investors. Instead, they argue that Marcus and Gaynor properly were acting as agents for the other partners as undisclosed principals to reach an agreement for the benefit of all of the plaintiffs. The court's memorandum

of decision contains no finding with respect to the rights of undisclosed principals. If the court should have addressed this argument, the plaintiffs could have sought an articulation pursuant to Practice Book § 66-5. Because they did not do so, we do not have a record sufficient to permit appellate review of this issue. See Practice Book §§ 60-5 and 61-10.

The plaintiffs likewise have failed to provide a record to sustain their other arguments that their identity was established at trial. We do not have the benefit of the court's response to the plaintiffs' allegations that their identity was established by the fact that they were named as lessors in the contract between NCDC and the defendant. Similarly, the court did not address the plaintiffs' appellate argument that their identity was of no moment because the defendant sought investors without regard to their identity.

The facts recited in the court's memorandum of decision support the court's concerns about the identity of the parties who had participated in the alleged oral agreement. The plaintiffs' arguments to the contrary do not add up to a showing that the court's findings were clearly erroneous.

B

Terms of the Agreement

The court also found that the plaintiffs had failed to prove the terms of their alleged oral agreement. Our case law requires "definite agreement on the essential terms of an enforceable agreement." *Willow Funding Co., L.P.* v. *Grencom Associates*, 63 Conn. App. 832, 845, 779 A.2d 174 (2001); see also *Suffield Development Associates Ltd. Partnership* v. *Society for Savings*, 243 Conn. 832, 843, 708 A.2d 1361 (1998); *Coady* v. *Martin*, 65 Conn. App. 758, 766, 784 A.2d 897 (2001), cert. denied, 259 Conn. 905, 789 A.2d 993 (2002).

A central term of the oral agreement was the defendant's alleged promise to guarantee the plaintiffs' investments for ten years. The evidence at trial, however, included a letter from Marcus to assistant attorney general Arnold I. Menchel, in which Marcus acknowledged that the state was not a guarantor of leases between landlords and service providers. In light of that letter, the court properly found that the plaintiffs' awareness of the defendant's interest in long-term leases of group homes did not establish that *any* of the essential terms of any such arrangement had been agreed upon.

As they did at trial, the plaintiffs point to the various manifestations of the state's interest in group home investments as the source for the terms of their contract with the defendant. They note that, when asked, the defendant wrote letters to *other* potential investors and to financial institutions. Those letters referred to the guarantees that the plaintiffs seek to enforce. The plaintiffs do not allege that they, or Marcus on their behalf, ever discussed their own investment proposal with the defendant at any time other than at the disputed Richardson conference. The defendant is not answerable to the plaintiffs for letters of which the plaintiffs had no knowledge.

Alternatively, the plaintiffs argue that the communications that they received from the state with respect to group homes for persons with mental retardation were in the nature of a general offer by the defendant that contained the basic terms of their agreement. They maintain that they accepted this offer by making the investments in group homes that the defendant had encouraged.

The linchpin of this argument is the assumption that our contract law recognizes the concept of a general offer. The plaintiffs maintain that there is a functional

equivalence between offers made to identifiable entities and offers made to the general public. The plaintiffs cite no authority for this proposition and we know of none. Statements that urge members of the general public to take some action in response thereto usually are characterized as advertisements. Advertisements invite offers rather than acceptances. See 1 Restatement (Second), Contracts § 26, p. 75 (1981); *Mesaros* v. *United States*, 845 F.2d 1576, 1580–81 (Fed. Cir. 1988); *Hoon* v. *Pate Construction Co.*, 607 So. 2d 423, 425–26 (Fla. App. 1992), cert. denied, 618 So. 2d 210 (Fla. 1993); *Kane* v. *League of Oregon Cities*, 66 Or. App. 836, 840–41, 676 P.2d 901, review denied, 296 Or. 829, 679 P.2d 1366 (1984).

It follows that, at best, the defendant was soliciting offers from investors. It is reasonable to construe the communications upon which the plaintiffs rely as an invitation for further discussions along the lines indicated by the state's communications. It is illuminating, furthermore, to compare the defendant's alleged contract practices with respect to investors with the defendant's undisputed practice of contracting with service providers for group homes on the basis of formal requests for proposals. That comparison provides further support for the defendant's argument that the essential terms of the department's contracts were not finalized because they were never in a written agreement.

We acknowledge that there is no bright line rule describing the essential elements of any and all enforceable contracts. Whether a term is essential turns "on the particular circumstances of each case." *Willow Funding Co., L.P.* v. *Grencom Associates*, supra, 63 Conn. App. 845. The circumstances of this case include the fact that the plaintiffs did not prove the amount of funds that they would commit to investments in group homes, the expected duration of their investments, the

applicability of the alleged agreement to properties or investors not as yet identified, or the effective date of their agreement.

In light of those unproven allegations of fact, it was not clearly erroneous for the court to find that the plaintiffs had failed to prove the essential terms of their alleged contract with the defendant. The plaintiffs consistently have argued that the most important term of their alleged agreement was the defendant's guarantee of their investments. In his testimony at trial, Marcus admitted that the investors had not reached an agreement with the defendant on this central issue. The rest is conjecture.

## C

### Authority

Under General Statutes § 17a-218 (b),[4] the defendant had the authority to enter into contracts for the development of group homes. The plaintiffs argue that the defendant's authority to contract conferred similar authority on Richardson because she was the defendant's director for Region One. We are not persuaded that Richardson had either actual or apparent authority to make the statements that the plaintiffs attribute to her.

The trial court found that Richardson lacked actual authority to speak for the defendant. Richardson denied

---

[4] General Statutes § 17a-218 (b) provides in relevant part: "The commissioner shall plan, develop and administer a comprehensive program of community-based residential facilities including, but not limited to, transitional facilities, group homes, community training homes and supervised apartments. On or after January 1, 1997, every contract by the commissioner for the construction, renovation or rehabilitation of a community-based residential facility shall be awarded to the lowest responsible and qualified bidder on the basis of competitive bids . . . ."

that she had any such authority. No evidence was adduced at trial to rebut her testimony.[5]

The plaintiffs argue on appeal that Richardson could commit the defendant to an oral contract because she spoke to the plaintiffs in her official capacity.[6] The inference that the plaintiffs would have us draw from Richardson's status depends on their assumption that authority is indivisible. That is not so. Our case law holds that authority to perform services on behalf of a principal does not automatically confer actual or apparent authority to bind the principal in other respects. A principal is bound to contracts executed by an agent only "if it is within the agent's authority to contract on behalf of that principal . . . ." (Citations omitted.) *E. Paul Kovacs & Co.* v. *Alpert*, 180 Conn. 120, 125, 429 A.2d 829 (1980); *Hollywyle Assn., Inc.* v. *Hollister*, 164 Conn. 389, 396, 324 A.2d 247 (1973); 1 Restatement (Second), Agency §§ 140, 186 (1958).

Even if Richardson lacked actual authority to enter into an oral contract on behalf of the defendant, the plaintiffs claim that she had apparent authority to do so. They argue that their communications with other state agents demonstrate her apparent authority to bind the defendant. The flaw in this argument is that the law of apparent authority is more limited.

"Apparent authority is derived not from the acts of the agent but from the deliberate or inadvertent acts of the principal. . . . Apparent authority has two elements. First, it must appear from the acts of the principal that the principal held the agent out as possessing

---

[5] The plaintiffs also argue that the agreement allegedly made with Richardson was not ultra vires. They do not allege that the court made any finding with respect to ultra vires. We need not address this argument.

[6] They make similar assertions with respect to conversations with other state agents. Because they do not allege that they entered into a contract with any of these state agents, these conversations do not implicate the authority to contract.

sufficient authority to embrace the act in question, or knowingly permitted him to act as having such authority . . . . Second, the party seeking to bind the principal must have acted in good faith reliance on that appearance of authority." (Citations omitted; internal quotation marks omitted.) *Edart Truck Rental Corp.* v. *B. Swirsky & Co.*, 23 Conn. App. 137, 139–40, 579 A.2d 133 (1990); see *Tomlinson* v. *Board of Education*, 226 Conn. 704, 734–35, 629 A.2d 333 (1993).

In this case, the court observed that "there was no testimony that [the defendant] either directly or indirectly did anything that could be construed as allowing his employees to enter into contracts on his behalf." The plaintiffs have cited no evidence to the contrary. The court also found that the plaintiffs had not proven their reliance on an appearance of authority because Marcus could not reasonably have believed "that the state employees [with whom he spoke] could, under such an informal arrangement, bind their [principal] in an oral contract."

"The issue of apparent authority is one of fact, requiring the trier of fact to evaluate the conduct of the parties in light of all the surrounding circumstances. . . . Only in the clearest of circumstances, where no other conclusion could reasonably be reached, is the trier's determination of fact to be disturbed." (Citations omitted.) *Lettieri* v. *American Savings Bank*, 182 Conn. 1, 9, 437 A.2d 822 (1980). The plaintiffs have not provided any basis for disturbing the finding of the trial court.

We conclude that the court's finding concerning the existence of the alleged oral contract was not clearly erroneous. Specifically, the plaintiffs have not demonstrated clear error in the court's findings with respect to the identity of the parties, the terms of their alleged agreement and the authority of those with whom the plaintiffs dealt to impose contract liability upon the

defendant. The plaintiffs' failure to surmount any one of these obstacles would have sufficed to defeat their claim for relief. Together, these deficiencies of proof conclusively demonstrate that the court did not abuse its discretion in ruling against the plaintiffs on their contract claim.

## II

In addition to finding that the existence of an oral agreement had not been proven, the trial court also held that the plaintiffs could not prevail because their alleged oral agreement did not satisfy the requirements of the statute of frauds, General Statutes § 52-550.[7] The court observed that the case before it was "one in which the purpose of the statute of frauds is best exemplified—the need for reliable evidence concerning the existence and actual terms of a contract at issue." We agree.

Compliance with the statute of frauds requires, as a minimum, proof of the essential terms of the agreement that is at issue. *Fruin* v. *Colonnade One at Old Greenwich Ltd. Partnership*, 38 Conn. App. 420, 426, 662 A.2d 129 (1995), aff'd, 237 Conn. 123, 676 A.2d 369 (1996); *Scinto* v. *Clericuzio*, 1 Conn. App. 566, 568, 474 A.2d 102 (1984); see also *Montanaro* v. *Pandolfini*, 148 Conn. 153, 157, 168 A.2d 550 (1961).

Having decided that the plaintiffs had failed to prove agreement on these essential terms, the court held that the alleged oral agreement violated the statute of frauds. On this basis, the court rejected the plaintiffs' argument that, by developing their group homes, they had fully

[7] General Statutes § 52-550 (a) provides in relevant part: "No civil action may be maintained in the following cases unless the agreement, or a memorandum of the agreement, is made in writing and signed by the party, or the agent of the party, to be charged . . . (4) upon any agreement . . . concerning real property; (5) upon any agreement that is not to be performed within one year from the making thereof . . . ."

performed their obligations so that § 52-550 (a) (4) was inapplicable. We agree.

The court also alluded to the requirement of the statute of frauds that there must be written proof of an agreement "not to be performed within one year . . . ." General Statutes § 52-550 (a) (5). On its face, an alleged oral agreement for a ten year guarantee appears to violate this provision. See *C. R. Klewin, Inc.* v. *Flagship Properties, Inc.*, 220 Conn. 569, 582–83, 600 A.2d 772 (1991). In light of the lack of proof of the existence of the alleged oral contract, we need not explore the applicability of the one year provision in this case.

## III

This case exemplifies the losses that investors incur when, in good faith, they participate in ventures that unexpectedly turn out to be more risky than anticipated. We acknowledge that the plaintiffs' investments in group home leases were made in service of the public policy of improving residential housing for adults with mental retardation. The fundamental issue, at trial and in this court, is, nonetheless, whether the plaintiffs and the defendant entered into an oral agreement guaranteeing the economic viability of these investments over a ten year period. The trial court found that the plaintiffs did not prove the existence of such a contract. Our examination of the record and the arguments before us persuades us that this finding of fact was not clearly erroneous.

The judgment is affirmed.

In this opinion the other judges concurred.