**In re: Doreen CARPENTER, Debtor.**

**No. 04–22096.**

United States Bankruptcy Court,
D. Connecticut.

Aug. 12, 2005.

Frank A. Appicelli, Esq. and Kate K. Simon, Esq., Bingham McCutchen LLP, Hartford, CT, Counsel for Debtor.

Kevin J. Burns, Esq., Cohen, Auger, Burns & Hard, Hartford, CT, Counsel for Creditor United States of America.

*RULINGS ON CREDITOR'S OBJECTION TO PLAN CONFIRMATION AND DEBTOR'S OBJECTION TO PROOF OF CLAIM*

ROBERT L. KRECHEVSKY, United States Bankruptcy Judge.

## I.

### ISSUE

Primarily at issue in this proceeding is the proper computation of the dollar amount necessary to cure a mortgage loan default ("the arrearage") for the purposes of a Chapter 13 plan where the United States Department of Agriculture ("the USDA") granted the mortgage loan ("the mortgage loan") under Title V of the Housing Act of 1949. The parties have presented the matter to the court on briefs, exhibits and affidavits from which, together with court files, the following uncontested background has been derived.

## II.

### BACKGROUND

The background subsumes a state-court foreclosure action ("the foreclosure action") pending over three years during which the debtor has filed three bankruptcy petitions. Doreen Carpenter ("the debtor") filed, pro se, a first bankruptcy petition under Chapter 7 on March 15, 2002, shortly after the USDA filed a mortgage foreclosure complaint in state court involving the debtor's residence located at 56 David Circle, Putnam Connecticut ("the residence"). The USDA, on May 9, 2002, received relief from stay to continue the foreclosure action. The bankruptcy court granted the debtor a discharge on August 6, 2002 and, on August 28, 2002, closed this case.

The debtor, on December 3, 2003, filed a second pro se bankruptcy petition, this time, under Chapter 13. The court dismissed this case on May 19, 2004.

The debtor, represented by counsel, on July 12, 2004, filed the instant Chapter 13 case. On September 9, 2004, the debtor filed a Chapter 13 plan in which she proposed, over a five-year term, to cure the arrearage allegedly totaling $16,620, due the USDA, by paying $277 monthly to the Chapter 13 trustee. The USDA filed a proof of secured claim in the debtor's case ("the proof of claim") setting forth the value of the residence as $117,000; the USDA's total mortgage claim as $241,668.01, and the arrearage included in

the secured claim as $70,818.44.[1]

The USDA, on September 24, 2004, filed an objection to confirmation of the debtor's plan, and the debtor, on December 6, 2004, filed an objection to the USDA's proof of claim. The court ruling deals with these objections.

The mortgage loan, settled on July 27, 1990, was made pursuant to a program operated by the USDA to enable rural, low-income borrowers to purchase a home. *See United States v. Wheeler*, 726 A.2d 1264, 1265 (Me.1999) ("The interest subsidies were provided ... pursuant to Title V of the Housing Act of 1949, a federal program providing low interest loans to individuals, primarily in rural areas, who cannot obtain credit and are, therefore, unable to secure decent housing.") (citation and quotation marks omitted). The mortgage note executed by the debtor, in the principal amount of $105,000, provided for equal monthly amortization payments of interest and principal of $835 for 38 years, at an annual interest rate of 9.25 percent. The debtor executed a "Subsidy Repayment Agreement" ("the SRA") to secure and establish repayment of the interest subsidy ("the subsidy") the debtor receives from the USDA. The subsidy is renewable annually, if the debtor remains eligible, with the amount determined by the USDA each year on the basis of the debtor's income and expenses. For the years from 1990 through September 1998, the subsidy amounted to $557 monthly, requiring the debtor to pay $278 monthly on the note. The USDA declined to renew the subsidy as of October 1998, but reinstated it prospectively as of June 2002. From June 2002 through June 2004, USDA determined the debtor be required to pay on the note $276.88 monthly.[2]

The SRA, in paragraph 3 and 4, provides as follows:

3. I agree that the real property described in the mortgage listed above is pledged as security for the repayment of the subsidy received or to be received. I agree that the subsidy is due and payable upon the transfer of title or non-occupancy of the property by me. I understand that the real estate securing the loan is the only security for the subsidy received. I further understand that I will not be required to repay any of the subsidy from other than the value (as determined by the Government) of the real estate, mortgaged by myself in order to obtain a Section 502 Rural Housing (RH) loan.

4. I understand that so long as I continue to own the property and occupy the dwelling as my residence, I may repay the principal and interest owed on the loan and defer repaying the subsidy amount until title to the property is conveyed or the dwelling is no longer occupied by me. If such a request is made, the amount of subsidy to be repaid will be determined when the principal and interest balance is paid. The mortgage securing the FmHA RH loan will not be released of record until the total amount owed the Government has been repaid.

The proof of claim indicates the debtor stopped making monthly mortgage payments to the USDA as of June 27, 1997. In the foreclosure action, the Connecticut

---

1. The sum of the items indicated in the proof of claim as being included in the arrearage is $70,717.94, rather than $70,818.44 as shown therein.

2. The USDA's brief, filed June 14, 2005, states: "The return of debtor to her subsidized rate was granted unilaterally by the USDA in June 2002 as a matter of policy because the debtor filed Chapter 7 bankruptcy proceedings."

Superior Court ("the state court"), on June 8, 2004, rendered a judgment of foreclosure by sale.[3] The judgment determined the total debt to be $228,186.21.

## III.

### THE PARTIES' POSITIONS

#### A.

USDA calculated the arrearage in the proof of claim as follows:

| | |
|---|---|
| 1. 16 past due payments 6/27/97—9/27/98 at $278.00 per month. | $ 4,448.00 |
| 2. 44 past due payments 10/27/98—5/27/02 at $835.00 per month. | $ 36,740.00 |
| 3. 26 past due payments 6/27/02—6/27/04 at $276.88 per month. | $ 7,198.88 |
| 4. Advance for tax, etc. | $ 10,975.84 |
| 5. Legal Fees | $ 4,462.50 |
| 6. Legal Costs | $ 967.50 |
| 7. Committee Fees, 1st Sale | $ 2,660.75 |
| 8. Committee Fees, 2nd Sale | $ 3,264.47 |
| | $ 70,717.94 |

The debtor contends that in line 2, the USDA errs when it asserts that the 44 past due payments are at the rate of $835.00 per month rather than the subsidized $276.88 monthly amount. The USDA responds that it accelerated the debt when the debtor stopped making monthly payments after June 27, 1997, as it had the right to do under the note provisions.[4] Furthermore, in accordance with applicable regulations, the USDA declined to renew the debtor's subsidy on the renewal date following acceleration.[5]

The debtor, in support of her position, cites *In re Gaskin,* 120 B.R. 13 (D.N.J. 1990), which held that under regulation 7 C.F.R.1944.34(k)(2) then in effect, the subsidy renewal was retroactive when a debtor proposed to cure a default under a Chapter 13 plan. The regulation was repealed in 1996 and the USDA argues that *Gaskin* is inapposite to the present proceeding.

#### B.

The debtor also objects to the total mortgage debt of $241,668.01 asserted in the proof of claim, as determined by the state court in the foreclosure judgment and adjusted for interest, costs and fees. The USDA contends the state-court judgment was a final judgment, and that collateral estoppel bars the debtor from attacking the judgment.

## IV.

### DISCUSSION

■ Although a creditor bears the ultimate burden of proof concerning its claim, "A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim." Fed. R. Bankr.P. 3001(f). Once a creditor has filed

---

**3.** This was the second judgment of foreclosure by sale entered by the state court. The first was on October 27, 2003.

**4.** The note states:
DEFAULT: Failure to pay when due any debt evidenced hereby or perform any covenant or agreement hereunder shall constitute default under this instrument and any other instrument evidencing a debt of Borrower owing to, insured or Guaranteed by the Government or securing or otherwise relating to such a debt; and default under any such other instrument shall constitute default hereunder. UPON ANY SUCH DEFAULT, the Government at its option may declare all or any part of any such indebtedness immediately due and payable. (Note at 2.)

**5.** 7 C.F.R. 3550.211(g) provides: "If the borrower is receiving payment subsidy, the payment subsidy agreement will not be cancelled when the debt is accelerated, but will not be renewed unless the account is reinstated."

a valid proof of claim, the burden of production shifts to the debtor to rebut it.

## A.

### The Total Mortgage Debt

■ The court concludes that the total mortgage debt determined by the state court is binding in this federal court proceeding. Although the debtor argues otherwise, a state-court foreclosure judgment for foreclosure by sale is a final judgment. *See Willow Funding Co., L.P. v. Grencom Associates,* 63 Conn.App. 832, 835–38, 779 A.2d 174 (2001) (holding that a judgment of foreclosure by sale is a final judgment). "Under collateral estoppel, once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210, 217 (1979).

Accordingly, the debtor may not relitigate the total mortgage indebtedness determined by the state court in the foreclosure judgment. *Cf. also Johnson v. Smithsonian Inst.,* 189 F.3d 180, 185 (2d Cir.1999) (*Rooker–Feldman* doctrine "bars federal courts from considering claims that are inextricably intertwined with a prior state-court determination.")

## B.

### The Arrearage

Bankruptcy Code § 1322(b)(5) states, in relevant part, that a debtor's Chapter 13 plan may "provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending . . . ." Section 1322(e) further provides "if it is proposed in a plan to cure a default, the amount necessary to cure the default shall be determined in accordance with the underlying agreement and appli-cable non-bankruptcy law." In this proceeding, the applicable non-bankruptcy laws are the statutes and regulations applicable to the USDA housing program.

■ It is well established that curing a default through a Chapter 13 plan in accordance with § 1322(b)(5) "de-accelerates" the underlying debt.

> When Congress empowered Chapter 13 debtors to "cure defaults," we think Congress intended to allow mortgagors to "de-accelerate" their mortgage and reinstate its original payment schedule. We so hold for two reasons. First, we think that the power to cure must comprehend the power to "de-accelerate." This follows from the concept of "curing a default."

*DiPierro v. Taddeo, (In re Taddeo),* 685 F.2d 24, 26–27 (2d Cir.1982).

The debtor contends that *Taddeo* mandates that she be permitted to undo the non-renewal of her subsidy from October 1998 through May 2002 in calculating her missed mortgage payments and base the calculation of the arrearage on the subsidized payments that would have been in effect had she not defaulted. She cites *In re Gaskin,* 120 B.R. at 17, in which the District Court affirmed such an order by the Bankruptcy Court as "[c]onsistent with the policies underlying the Bankruptcy Code and the express language of 7 C.F.R. 1944.34(k)(2)." The debtor concedes 7 C.F.R.1944.34(k)(2) is no longer in effect. The USDA argues the present regulations include no similar provision for retroactive reinstatement of a nonrenewed subsidy agreement, except where nonrenewal was due to an error of the USDA; in all other cases where the subsidy agreement has lapsed, renewal becomes effective as of the next due date following approval. *See* note 5 *supra. Gaskin,* therefore, is unavailing.

 Nor does *Taddeo*'s "de-acceleration" reasoning support the debtor's position. The arrearage must be determined under the terms of the agreements and regulations applicable to the debt as it exists prior to its "de-acceleration," rather than by looking to what might have been had no default occurred. *See* Bankruptcy Code § 1322(e). Not until the default is cured are its consequences undone. *Taddeo*, 685 F.2d at 28 ("Therefore the [debtors] may first cure their default under (b)(3) and then maintain payments under (b)(5).").

 Finally, the debtor urges the court to rule that not retroactively reinstating the subsidy would be inequitable and inconsistent with the goals of the USDA housing program. The court cannot comply.

> "Bankruptcy courts do indeed have some equitable powers.... But the scope of the bankruptcy court's equitable power must be understood in light of the principle of bankruptcy law discussed already, that the validity of a claim is generally a function of underlying substantive law. Bankruptcy courts are not authorized in the name of equity to make wholesale substitution of underlying law controlling the validity of creditors' entitlements, but are limited to what the Bankruptcy Code itself provides."

*Raleigh v. Ill. Dept. of Revenue*, 530 U.S. 15, 24–25, 120 S.Ct. 1951, 147 L.Ed.2d 13 (2000).

The court finds no authority in the Bankruptcy Code for it to alter the criteria for USDA's awards of interest rate subsidies prior to cure of default under its low-income housing assistance program.

## V.

### CONCLUSION

In accordance with the foregoing discussion, the court sustains the USDA's objection to confirmation of the debtor's plan and overrules the debtor's objection to the USDA's calculation, as of the bankruptcy filing date, of the total mortgage debt and of the arrearage. To this latter amount, of course, may be added or subtracted any further amounts due or paid as of the plan confirmation date. It is

SO ORDERED.