Hinkle, J.
Plaintiff Charles Sizemore brings this partnership derivative action on behalf of Pennfox Associates (“Pennfox”) alleging wrongful conduct by Pennfox’s general partner, the general partner’s owners and operators and certain other affiliated businesses. This matter is before the court on plaintiffs motion for partial summary judgment under Mass.R.Civ.P. 56 on Counts II and III of the Amended Complaint. For the reasons discussed below, after hearing, the motion is denied.
BACKGROUND
The following is taken from the summary judgment record. The undisputed facts, and any disputed facts viewed in the light most favorable to the nonmoving pariy, are as follows.
Pennfox is a Connecticut limited partnership with a principal place of business at 7 Bullfinch Place, Suite 500, Boston, Massachusetts. Defendant I-R Maple Corp. (“Maple”), a Delaware corporation with a principal place of business at Bullfinch Place, Suite 500, is the general partner of Pennfox and owns a 1.1% interest therein. Maple is 100% owned and controlled by Presidio Capital Corp. (“Presidio”), a corporation organized under the laws of the British Virgin Islands with a principal place of business at 7 Bullfinch Place, Suite 500. Plaintiff Charles Sizemore (“Sizemore”) is a limited partner of Pennfox. The other limited partners are the Estate of Bernard B. Kaplan, Shirley Lester Arkin, Charles Badalamenti, Richard LaPointe, Philip Lozman, Estate of J.L. Lester, Jr., Norman and Barbara Nash, Lindy Tabor, Kenneth Thomas, La Ru Thomas, Universal Coal Coip., Gerald Vallee and Daniel Vreeland. The limited partners collectively own the remaining 98.9% of the interests in Pennfox.
*183 Defendant PCC Pennfox is a Delaware limited partnership with a principal place of business at 7 Bullfinch Place, Suite 500, Boston. Defendant PCC GP, a Delaware limited liability company with a principal place of business at 7 Bullfinch Place, Suite 500, is the general partner of PCC Pennfox. Defendant PCIC Manager Coip. (“PCIC”), a Delaware corporation with a principal place of business at 5 Cambridge Center, 9th floor, is the manager of PCC GP. Defendant Michael Ashner (“Ashner”) has been the President and sole director of Maple and PCIC and the President of Presidio since October 25, 1999. Defendant Peter Braverman (“Braverman”) has been the Vice President of Maple and PCIC and the Vice President and Assistant Secretary of Presidio since October 25, 1999. Defendant David King (“King”) is a shareholder, officer and director of Maple, PCIC and Presidio.
Pennfox was created in February of 1975 for the purpose of acquiring and improving a department store located in a Culver City, California shopping mall (“the Property”), entering into a long term lease for the Property with JC Penney Company, Inc. (“JC Penney”) and eventually selling the Property for a profit. The prospectus for Pennfox stated:
The tax consequences of an investment in the Partnership, the small current Cash Flow from such investment, and the illiquidity of such investment make Limited Partnership Interests suitable only for investors who have substantial net worth and substantial taxable income and should be purchased only as a long term investment.
The Partnership Agreement grants Maple the power and obligation to operate and manage Pennfox, while expressly restricting the limited partners from participating in the management or control of Pennfox’s business. The Partnership Agreement grants Maple the power and right to:
(i) manage the Partnership Property;
(ii) execute such documents as he may deem necessary or desirable for Partnership purposes;
(iii) acquire, sell, assign, convey, lease, mortgage or otherwise dispose of or deal with all or any part of the Partnership Property . . .
(iv) borrow money;
(v) perform or cause to be performed all of the Partnership’s obligations under any agreement to which the Partnership is a party or any obligations of the Partnership or otherwise in respect of any indebtedness secured in whole or part by, or by lien on, or security interest in, any portion of the Property;
(vi) employ, engage, retain or deal with any persons, firms or corporations to act as managing agents, brokers, accountants, or lawyers or in such other capacity as the General Partner may deem necessary or desirable, provided the compensation for such services is reasonable. The fact that a Partner is employed by, or is directly or indirectly affiliated or connected with, any such person, firm or corporation shall not prohibit the General Partner from employing or otherwise dealing with such person, firm or corporation.
The Partnership Agreement provides that Maple “shall not be liable to the Partnership or to the Limited Partners for any loss or liability incurred in connection with any act performed or omitted, nor for negligence or any other matter, except for any loss or liability incurred in connection with the wilful misconduct or gross negligence of the General Partner.” The Partnership Agreement states that it shall be governed and construed in accordance with the laws of the State of Connecticut.
The Property is a 2.8 acre parcel of land located in the Fox Hills Shopping Center in Culver City, California containing a 144,120 square foot building and a 20,000 square foot free standing facility. Pennfox acquired a leasehold interest in the land and a fee interest in the buildings located thereon by means of a multimillion dollar mortgage loan with a maturity date of October 20, 2000 (“the original mortgage”). The payoff amount of the original mortgage was $1,317, 191.18 on the maturity date. Pennfox entered into a Ground Lease dated December 1, 1975 with JC Properties, Inc., an affiliate of JC Penney. Pennfox then leased the Property to JC Penney under a lease agreement dated December 1, 1975 (“Penney Lease”). The initial term of the Penney Lease ran from December 17, 1975 to December 31, 2000. Under the Penney Lease, JC Penney had the right to extend the lease for five terms of five years each. On April 24, 2000, JC Penney exercised its first lease extension, continuing the lease until December 31, 2005.
Under the terms of the Penney Lease,' JC Penney’s exercise of the first lease extension required Pennfox to satisfy its existing mortgage indebtedness of $1,317,191.00 on October 20, 2000. Because the Partnership Agreement does not allow for additional mandatoiy contributions by the limited partners, Pen-nfox had either to find replacement financing to satisfy the mortgage indebtedness or demand that JC Penney prepay a balloon rental payment of $1,807,409.41 in lieu of the first 10 years of renewal rent. If Pennfox did not make such a demand on JC Penney, Pennfox’s lender had the right to force the payment as long as Pennfox’s mortgage balloon was outstanding. If Pen-nfox demanded the balloon rental payment, JC Penney had the right under Section 15(e) of the Penney Lease to purchase the Property for $1,137,461.77. If JC Penney exercised the purchase option, the Pennfox partners would lose the Property and not receive any additional payments.
JC Penney also had an option under the Penney Lease to purchase the Property on any payment date with 90 days notice for a price equal to the greater of fair market value as encumbered by the Penney Lease *184 or an amount calculated according to paragraph 3 of Schedule C, which was $770,433.64 after December 31, 2000. If Pennfox rejected such an offer, the Penney Lease would terminate. In addition, if JC Penney decided that the Property was no longer economical to it, it could exercise an economic discontinuance provision, Section 15(a) of the Penney Lease, which after December 31, 2000 would yield Pennfox a sale price of zero.
On September 6, 2000, the Pennfox limited partners received a letter which stated in part:
As a result of Penney’s exercise of the first renewal option, the Partnership has the option to require Penney to remit a lump sum rental payment to the Partnership at the expiration of the primary term in lieu of basic rental payments through December 31, 2010. However, if the Partnership elects to require the lump sum rental payment, Penney then has the option to purchase the Property for an amount stipulated in the Lease which would be sufficient to retire the Property’s mortgage debt, but would not generate proceeds to limited partners sufficient to pay the resulting tax liability generated from the disposition of the Property.
In an effort to maximize the benefits to limited partners and avoid a substantial “phantom” tax liability for limited partners, the Partnership is thus attempting to refinance the balloon on its mortgage debt. As a result, pending resolution of this issue, cash available for distribution from 1999 operations will be maintained in the Partnership’s reserve account.
Pennfox, through John Alba (“Alba”), attempted to refinance its first mortgage balloon balance through its two best customary third-party lenders, Deutsche Bank and GMAC Commercial Mortgage. These lenders were unwilling to provide financing for the Property because of JC Penney’s low credit rating, public speculation concerning the potential bankruptcy of JC Penney, and the fact that the Penney Lease was for a short term and allowed JC Penney to terminate the lease at any time, leaving the Property vacant.
Unable to obtain refinancing from a third-party lender, Pennfox utilized approximately $531,000 of its cash reserves and on October 20, 2000, obtained a loan from Presidio in the original amount of $870,335 (“the Loan”), the proceeds of which were used to satisfy the original mortgage. Braverman and King approved the decision to enter into the Loan, and Braverman, Alba and Cramer formulated the terms of the Loan. None of the limited partners gave their consent to the Loan either before or after the transaction was consummated. Braverman believed it was in Pennfox’s best interest to enter into the Loan to protect Pennfox’s interest in the Property by preventing JC Penney from having the right to acquire the Property at a price which would result in a loss to Pennfox or continue to occupy the Property until January 31, 2011 without making additional lease payments.
The Loan had a maturity date of July 30, 2011, at which time Pennfox was required to make a balloon payment of $450,171. The Loan included a prepayment penalty equal to the lesser of (i) yield maintenance based on the discounted value of the remaining debt service payments at a rate equal to the yield of US Treasury bonds having a similar maturity rate plus 50 basis points and (ii) 50% of the difference between (1) either the appraised liquidation value of the Property or the sale price of the Property if the prepayment was in connection with the sale of the Property and (2) the then outstanding debt balance.
According to Braverman, it would have been difficult for Pennfox to sell the Property before JC Penney’s exercise of the lease extension because of the risks associated with the uncertainty over whether JC Penney would renew the lease and remain a tenant. Before October of 2000, Maple had no communication with any potential buyer of the Property. In October, Jay Cramer (“Cramer”), on behalf of Pennfox, spoke to representatives of JC Penney and determined that JC Penney had no significant interest in repurchasing the Property at that time. In November of 2000, Braver-man approached KIN Properties, Inc. (“KIN”) concerning the sale of the Property and sent KIN lease information and cash flow summaries for the Property.
By letter dated February 2, 2001, an entity known as the Low-Income Housing Corporation (“LIHC”) informed PCC-Penn GP, LLC, Ashner, Braverman and King that it had contracted to acquire a majority of the limited partnership interests in Pennfox and, in connection with such purchase, would make a mortgage loan to Pennfox on terms more favorable than the Loan, including a 12% interest rate and no prepayment penalty. The letter stated that the transfer of the limited partnership interests was contingent upon Maple’s consent. LIHC offered to purchase limited partnership interests in Pennfox directly from the existing limited partners for $35,000 per limited partnership unit. Approximately 57% of the limited partners, including plaintiff, executed a purchase and sale agreement to sell their limited partnership interests to LIHC.
Maple intended to give Pennfox’s limited partners the opportunity to participate in the Loan; however, the Partnership Agreement does not allow for additional mandatory capital contributions by the limited partners. Accordingly, on February 15, 2001, the Loan was transferred from Presidio to a newly created entity, PCC-Pennfox Loan, L.P. (“the Loan Entity”)[3] and converted into a mortgage note (“the Promissory Note”) so that the limited partners could be asked to contribute their own money. Braverman and King approved the Promissory Note. Interest under the Promissory Note was payable at 13.125%, and the Loan Entity was permitted to retain 10% of Pennfox’s excess cash flow and 100% of Pennfox’s remaining excess cash flow until it received additional interest of 6.375% per *185 annum on the principal amount of the note. Thus, the Promissory Note bore an effective interest rate of 19.5%.
Pursuant to a Confidential Private Offering Memorandum dated January 22, 2001 (“the Offering”), each of the limited partners was given the opportunity to purchase ownership interests in the Loan Entity. The Offering described the terms of the Loan and stated that the Loan Entity is an affiliate of Maple. The Loan Entity also sent the limited partners a document entitled “Supplement No. 1 to Confidential Private Offering Memorandum” which responded to questions raised by the limited partners about the Loan, the marketing of the Property, the exploration of financing options, the plans for the Property and the Loan Entity’s plans for distributing cash flow. None of the limited partners chose to participate.
On April 2, 2001, KIN offered to purchase the Property for $1,875,000. On April 30, the limited partners received a letter informing them of this offer and seeking their consent to the sale. The letter indicated that Pennfox would net $592,486 from the sale of the Property, yielding a distribution of approximately $58,000 per investment unit, and stated:
The General Partner of the Partnership recommends that Limited Partners vote in favor of the sale of the Property. If the Property were not sold and the Partnership were to continue to be unable to obtain a mortgage, the bridge loan would be called unless another form of financing can be secured. There is no guaranty that another form of financing can be secured.
On May 8, 2001, LIHC wrote to the limited partners that it would release them from the purchase and sale agreements due to the higher third-party offer. On June 5, 2001, JC Penney exercised its right of first refusal under the Penney Lease to purchase the Property for $1,875,000. After satisfying the original mortgage debt, Pennfox sold the Property for $1,875,000 on July 24, 2001. Maple calculated the amount available for distribution to the limited partners from sale proceeds and reserves as $62,000 per limited partnership unit.
Sizemore filed this partnership derivative action on June 28, 2001. Count I of the Amended Complaint seeks an injunction preventing the defendants from disbursing the proceeds of the sale of the Property as a prepayment penalty under the Loan. Count II seeks to impose a constructive trust on that portion of the sale proceeds that would otherwise be used to pay the prepayment penalty. Count III alleges that Maple breached its fiduciary duty to Pennfox and the limited partners. Count IV alleges that Maple breached the Partnership Agreement. Count V alleges a civil conspiracy by all the defendants, while Count VI alleges a violation of the Unfair Trade Practices Act. Count VH seeks to pierce the corporate veil to hold Presidio, Ashner, Braverman and King liable. Finally, Count VIII seeks an accounting from Maple.
Under a temporary restraining order entered by this Court (Brassard, J.) on June 28, 2001 and a preliminary injunction entered (Brassard, J. on July 18, 2001), the amount of the prepayment penalty under the Loan, among other sums, are being held in a custodial account containing $1,414,051.
DISCUSSION
Summary judgment shall be granted where there are no genuine issues as to any material fact and where the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community Nat'l Bank v. Dawes, 369 Mass. 550, 553 (1976). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, and that the summary judgment record entitles the moving party to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). The moving party may satisfy this burden either by submitting affirmative evidence that negates an essential element of the opposing party’s case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of his case at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).
Plaintiff moves for partial summary judgment on Counts II and III of the Amended Complaint on the ground that as a matter of law Maple breached its fiduciary duty to the limited partners by entering into a self-dealing transaction, the Loan, without the informed consent of the limited partners.[4] The parties agree that under choice of lawprinciples and the terms of the Partnership Agreement, Connecticut law applies to Sizemore’s breach of fiduciary claim. Cf. Harrison v. Netcentric Corp., 433 Mass. 465, 472 (2001) (law of state of incorporation governs claims concerning corporation’s internal affairs, including breach of fiduciary duty).
Under Connecticut law, partners are bound in a fiduciary relationship and act as trustees toward each other and the partnership. Oakhill Associates v. D'Amato, 638 A.2d 31, 33 (Conn. 1994); Spector v. Konover, 747 A.2d 39, 43 (Conn.App.), cert. den., 759 A.2d 507 (Conn. 2000). The general partner of a limited partnership has the fiduciary duty of rendering true accounts and full information about anything which affects the partnership. Konover Development Corp. v. Zeller, 635 A.2d 798, 805 (Conn. 1994). Under Connecticut law, a fiduciary may not engage in self-dealing. Murphy v. Wakelee, 721 A.2d 1181, 1183-85 (Conn. 1998). A fiduciary such as a general partner is not permitted to make use of its relation of trust and confidence to benefit its own personal interest. This rule is strict in its requirements and in its operation: “[i]t extends to all transactions where the individual’s *186 personal interests may be brought into conflict with his acts in the fiduciary capacity, and it works independently of the question whether there was fraud or whether there was good intention." Murphy v. Wakelee, 721 A.2d at 1184; Mallory v. Mallory-Wheeler Co., 23 A. 708, 710-12 (1891); Spector v. Konover, 747 A.2d at 43. A self-dealing transaction is presumed invalid and is voidable unless the fiduciary can prove fair dealing by clear and convincing evidence. Murphy v. Wakelee, 721 A.2d at 1185-86; Konover Development Corp. v. Zeller, 635 A.2d at 805, 810; Spector v. Konover, 747 A.2d at 43. The fiduciary must showthat the transaction is entirely fair, made in good faith and for adequate consideration and upon a full understanding. Massoth v. Central Bus Corp., 134 A. 236, 238 (Conn. 1926); Jordan v. Jordan Co., 109 A. 181, 183 (Conn. 1920). The level of understanding required is knowledge of all material facts necessary to make an intelligent decision. Mallory 23 A. 708, 712 (Conn. 1891); Dzen v. Dzen, 1999 WL 130545 at * 7 (Conn.Super.).
Here, the defendants’ conduct in entering into the Loan constitutes self-dealing and is presumptively a breach of fiduciary duly. The burden thus shifts to Maple to prove by clear and convincing evidence that the transaction was fair, in good faith and made upon a full understanding. On the present summary judgment record, the defendants have no reasonable expectation of meeting this burden of proof, given the undisputed fact that the terms of the Loan were not disclosed to the limited partners before the transaction and thus could not have been made upon a full understanding.
Nonetheless, the defendants contend that the summary judgment record reveals a genuine issue of material fact with respect to the fairness of the transaction under all the circumstances, with disclosure only one factor to be considered, citing Konover Development Corp. v. Zeller, 635 A.2d 798 (Conn. 1994). In Zeller, the Connecticut Supreme Court held that in the context of a commercial limited partnership involving sophisticated businessmen, a more relaxed standard of fairness applies, and important factors in determining whether a particular transaction is fair include a showing by the fiduciary that he made a free and frank disclosure of all the relevant information he had; that the consideration was adequate; and that the limited partner had competent and independent advice before completing the transaction. In addition, the court is to consider the relative sophistication and bargaining power among the parties. Konover Development Corp. v. Zeller, 635 A.2d at 809; Spector v. Konover, 747 A.2d at 44.
Plaintiff does not address the applicability of the Zeller standard of fairness to this case. This Court notes that Zeller did not involve a typical case of self-dealing but rather a situation where the general and limited partners, who owned equal shares in the partnership and had ongoing disagreements concerning the partnership’s real estate development project, negotiated a contract governing their relationship and amended their partnership agreement accordingly. The Connecticut Supreme Court was then called upon to decide whether the general partner owed the limited partner any fiduciary duty in exercising its rights under the parties’ contract. See Konover Development Corp. v. Zeller, 635 A.2d at 801-03, 806-09. Indeed, the Connecticut Court of Appeals has stated that the Zeller standard is most appropriately applied:
in situations where a principal challenges the fairness of a particular transaction in which both the principal and the fiduciary made a fully informed decision to act in a manner that is seemingly contrary to the normal fiduciary relationship. Implicit in the Zeller standard is the requirement that the principal consent to the transaction carried out by the fiduciary. To invoke the Zeller standard in an attempt to justify the fairness of a particular transaction, the fiduciary must be able to show that there was some agreement among the parties allowing the fiduciary to act in a manner that may otherwise be a breach of fiduciary duty.
Spector v. Konover, 747 A.2d at 44 (concluding that Zeller standard does not apply to case involving diversion of partnership funds to defendant-controlled entities and retention of interest).
On the undisputed facts in the summary judgment record, this case is not one in which the limited partners consented to the Loan. However, the defendants contend that this is a case where the parties agreed to allow transactions which would otherwise constitute a breach of fiduciary duty to occur. The defendants’ argument that the Partnership Agreement’s broad grant of authority to Maple to deal with partnership property and to borrow money constitutes prior consent to a self-dealing transaction such as the Loan is unpersuasive. In general, the terms of a limited partnership agreement cannot negate the fiduciary duty between partners. Konover Development Corp. v. Zeller, 635 A.2d at 808. A broad power to borrow money does not relieve Maple of the general duty of full disclosure in self-dealing transactions such as the Loan. The defendants further note that Section 34-21 of the Revised Uniform Limited Partnership Act (“RULPA”) provides, “(e)xcept as provided in the partnership agreement, a partner may lend money to and transact other business with the limited partnership and, subject to other applicable law, has the same rights and obligations with respect thereto as a person who is not a partner.” Conn. Gen. Stat. §34-21 (1997). Assuming the defendants are correct that RULPA applies to Pennfox,[5] the cited provision does not appear to eliminate the requirement that self-dealing transactions accord with the fiduciary duty of full and fair disclosure.
*187 Nonetheless, the Partnership Agreement permits Maple to “employ, engage, retain or deal with” persons, firms or corporations affiliated with a partner “to act as managing agents, brokers, accountants, or lawyers or in such other capacity as the General Partner may deem necessary or desirable, provided the compensation for such services is reasonable.” The defendants argue that this provision is not limited to personal services and encompasses the use of an affiliated entity as a lender. They thus contend that this provision constitutes an agreement allowing Maple to engage in self-dealing which might otherwise be deemed a breach of fiduciary duty.
It is unclear whether this is the type of agreement among the parties which the Connecticut courts view as necessary to invoke the Zeller standard. See Spector v. Konover, 747 A.2d at 44 (noting that defendant produced no evidence of an explicit agreement allowing the defendants to use partnership property for personal gain). However, given the ambiguity of the Partnership agreement of this provision, there is a genuine issue of material fact with respect to the parties’ intent which precludes the award of summary judgment. In addition, assuming that the provision of the Partnership Agreement at issue brings this case within the relaxed Zeller standard, the summary judgment record reveals genuine issues of material fact concerning the relative sophistication of the parties and whether the limited partners were harmed or benefitted by the Loan.[6]
Summary judgment is also inappropriate at this time given the lack of clarity in Connecticut law as to whether the Zeller standard of fairness relied on by the defendants involves a balancing of the four factors mentioned in that case or requires a showing of three factors, including that the fiduciary “made a free and frank disclosure of all the relevant information he had” and that the limited partner “had competent and independent advice before completing the transaction.” See Konover Development Corp. v. Zeller, 635 A.2d at 809. One lower court applying Zeller has suggested that all four factors are necessary for a fiduciary to sustain its burden of demonstrating fair dealing. See Willow Funding Co. v. Grencom Assoc., 2000 WL 151236 at *13 (Conn.Super.), aff'd. on other grounds, 779 A.2d 174 (Conn.App. 2001). Cf. Springfield Oil Services, Inc. v. Conlon, 2001 WL 357581 at 6 (Conn.Super.) (concluding that fiduciary proved fairness of transaction by clear and convincing evidence where private placement memorandum repeatedly disclosed identity of affiliated entity and the allegedly “self-dealing” terms governing the investment, consideration was fair, and partner was sophisticated securities broker who relied on own expertise — all four factors apparently met). If this view of the law is correct, the defendants’ contention that the Loan was fair under the circumstances could not prevail given the undisputed lack of prior disclosure of its terms. The parties should research this issue thoroughly to provide this court with guidance at further stages of this litigation.[7]
ORDER
For the foregoing reasons, it is hereby ORDERED that the plaintiffs motion for partial summary judgment is DENIED.

 PCC Pennfox was formed under Delaware law on Januaiy 8, 2001.

 Although Count III of the complaint alleges various other breaches of fiduciary duly by Maple, those are not at issue in the pending motion.

 Section 34-38(c) of RULPA states that “[a] limited partnership formed under any statute of this state on or after October 1, 1961, and prior to October 1, 1979, shall continue to be governed by the provisions of chapter 610 of the statutes [Uniform Limited Partnership Act], revision of 1958, revised to 1979.” Conn. Gen. Stat. §34-38 (c)(1997). The defendants argue, however, that Pennfox is governed in all substantive respects by RULPA because §34-38(a) provides that “[a] limited partnership formed under any statute of this state prior to October 1, 1979, may become a limited partnership formed under this chapter by complying with the provisions of Section 34-10.” Conn. Gen. Stat. §34-38(a) (1997). Section 34-10 sets forth certain information which the certificate of limited partnership must contain and requires that a certificate of limited partnership be executed in accordance with Section 34-10a. Conn. Gen. Stat. §34-10 (1997). Section 34-10a requires a certificate of amendment to be signed by at least one general partner and each other partner designated as a new general partner. Conn. Gen. Stat. §34-10a(2) (1997). Pennfox filed certificates of amendment on December 10, 1975, December 1, 1976, and November 1, 1982. These amendments are signed by one general partner.

 A1so unresolved on the present summary judgment record is the effect of the provision in the Partnership Agreement that the General Partner shall be liable to the Limited Partners only for “willful misconduct or gross negligence of the General Partner.” Plaintiff does not address this provision in his brief.

 In the area of usurpation of corporate opportunity, the Connecticut Supreme Court has declined to adopt a bright line rule making disclosure and consent determinative of fiduciary liability, while recognizing the importance of timely and full disclosure. See Ostrowski v. Avery, 703 A.2d 117, 126-27 (Conn. 1997). Thus, even in the absence of prior adequate disclosure, a corporate fiduciary may establish by clear and convincing evidence that a transaction was fair and did not harm the corporation. See id. at 121, 124, 128 (stating that usurpation of corporate opportunity cases are analogous to self-dealing transaction cases, and that elements of an usurpation claim are a fiduciary duty and the existence of a corporate opportunity, after which burden shifts to fiduciary to show by clear and convincing evidence the fairness of his dealings with the corporation).